2022 UT App 100

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ROLAND DAVID CARRERA,
Appellant.

Opinion
No. 20181053-CA
Filed August 18, 2022

Fifth District Court, Beaver Department
The Honorable Keith C. Barnes
No. 171500074

Aaron P. Dodd, Attorney for Appellant

Sean D. Reyes and David A. Simpson,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGE
JILL M. POHLMAN and JUSTICE DIANA HAGEN concurred as to
Parts I and III. JUSTICE HAGEN authored a separate Opinion as to
Part II in which JUDGE POHLMAN concurred.[1]

HARRIS, Judge:

¶1     A jury found Roland David Carrera guilty of several
serious crimes, including aggravated kidnapping and various
sexual offenses. At trial, Carrera's former fiancée (Betty[2]) testified

---

1. Justice Diana Hagen began her work on this case as a member
of the Utah Court of Appeals. She became a member of the Utah
Supreme Court thereafter and completed her work on the case
sitting by special assignment as authorized by law. *See generally*
Utah R. Jud. Admin. 3-108(4).

2. A pseudonym.

that Carrera had held her at knifepoint, cut her neck, punctured her shoulder, made her strip naked, and forced her to engage in sexual acts. Carrera now appeals his convictions, challenging the sufficiency of the evidence on some of his convictions and asserting that his trial attorney rendered ineffective assistance that he believes affected all of his convictions. For the reasons discussed herein, we find merit in many of Carrera's arguments. We vacate one of Carrera's convictions for forcible sodomy and remand with instructions for acquittal on that count. And we vacate Carrera's other convictions, including the conviction for aggravated kidnapping, on the basis of ineffective assistance of counsel, and remand this case for a new trial or other proceedings consistent with this opinion.

BACKGROUND[3]

¶2     In 2017, Carrera and Betty lived together in Milford, Utah with their baby boy and Betty's fifteen-year-old son from a previous relationship. Their relationship had been good at first but worsened over time, with Carrera often accusing Betty of cheating on him. After their child was born, the relationship deteriorated even further and became tense. One summer evening, when the baby was about four months old, Carrera and Betty, along with the baby, made the approximately two-hour drive to a town just across the Arizona border to pick up a car from Betty's mother.

¶3     When they arrived in Arizona, Carrera loaded the car onto a trailer. Betty's mother then offered to watch the baby while the

---

3. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Rosen*, 2021 UT App 32, n.1, 484 P.3d 1225 (quotation simplified). In particular, the facts set forth in the first few paragraphs of this section reflect Betty's account of the events in question.

couple visited the casinos in nearby Mesquite, Nevada. While at the casinos, Carrera became "[r]eally drunk." On their way back to her mother's house, Betty told Carrera that she wanted him to move out. After picking up the baby, Carrera and Betty then drove back toward Milford and "were fighting the whole time" about Carrera moving out. As they approached Milford, Carrera—who was driving—did not proceed directly home but, instead, expressed a desire to visit the residence of one of Betty's coworkers (Coworker), with whom he believed Betty was having an affair. By this point, it was approximately 2:00 a.m. When Betty refused to show Carrera where Coworker lived, Carrera pulled a knife from his pocket, held it to Betty's neck, and demanded to know where Coworker lived. Betty then directed Carrera to Coworker's house, where Carrera—still with the knife to her neck—told Betty that he was going to take her to the door, kill her, and let Coworker watch as she bled to death.

¶4 Carrera did not follow through on this threat, but he did make a shallow cut on Betty's neck with the knife. With Betty now bleeding from her neck, Carrera put the car into gear and drove away from Coworker's house, telling Betty that he was going to go visit two of her friends—both of whom lived nearby—and that he was going to kill them and their children in retribution for their alleged involvement in the supposed affair between Betty and Coworker. But Carrera did not follow through with this threat either, and instead drove into a nearby canyon.

¶5 On their way up the canyon, Carrera instructed Betty to take off her clothes and told her that he was going to drop her off and force her to walk back home naked. He then forced Betty out of the truck and she began walking, but Carrera made her return to the truck once he saw that they were close to a campground. Soon thereafter, Carrera undid his pants and attempted "to insert his penis into [Betty's] anus." Betty asked him to "please stop," which he eventually did, but Carrera then inserted his fingers into Betty's anus "two or three times." A few minutes later, Carrera

punctured Betty's shoulder with the knife and again inserted his fingers into her anus as well as her vagina.

¶6     Carrera then drove back down the canyon, and Betty asked him to take her home, assuring him that she would never tell anyone about what had happened that night. Carrera told her that if she did tell anyone, he would kill her and her family. The couple eventually returned to their house, and Betty took the baby inside to put him to sleep. She then got dressed and went into the kitchen, where Carrera had poured shots of tequila. Betty told Carrera that she did not want to drink, but Carrera insisted. When Betty drank the shot, she started to vomit, which caused the wound on her neck—which had stopped bleeding—to reopen and start to bleed again. Betty and Carrera then proceeded to the bedroom, where Carrera took Betty's clothes off, performed oral sex on her, and had vaginal intercourse with her. Betty testified that she was "scared" and "just did whatever [Carrera] told [her] to do." After Carrera had fallen asleep, Betty took the knife from his shorts, woke up her fifteen-year-old son, and told him to hide the knife under his mattress. Betty then explained to her son some of what had happened, and at that point, they—along with the baby—left the home and went to Betty's father's house. Soon after they arrived, Betty's father called the police. Betty was then taken to the hospital for examination of her injuries.

¶7     After investigation, the State charged Carrera with various crimes, including one count of aggravated kidnapping, five counts of object rape, three counts of forcible sodomy, one count of rape, one count of aggravated sexual assault, one count of aggravated assault, one count of commission of domestic violence in the presence of a child, and three counts of threat of violence.[4]

---

4. Carrera was also charged with one count of damage to, or interruption of, a communication device, but that count was dismissed by the trial court after the preliminary hearing.

¶8     Very early on in the case, long before trial, Carrera filed a motion to change venue, asserting that because Betty's family is well-known within Beaver County, and because of the "inaccurate rumors that have permeated the Beaver County communities stemming from" the allegations against him, Carrera would not receive a fair trial in Beaver County. The trial court denied this motion.

¶9     Also prior to trial, the State filed a motion seeking to introduce evidence, pursuant to rule 404(b) of the Utah Rules of Evidence, that Carrera had committed various bad acts in the past, including on one occasion brandishing a knife and on another occasion stabbing someone in the stomach. After oral argument, the court denied the State's motion, concluding, among other things, that any probative value these incidents might have was substantially outweighed by the risk of unfair prejudice.

¶10     The case proceeded to a three-day jury trial. During jury selection, the court asked the members of the jury pool if they knew any of the potential witnesses in the case. In response, a potential juror (Juror) stated that one of the law enforcement officers (Deputy) who had investigated the case was married to her cousin. The court then asked Juror if she would give more weight to Deputy's testimony because she was familiar with him. Juror responded affirmatively, and indicated that she would give his testimony more weight "because I trust him." Carrera's attorney (Trial Counsel) did not challenge Juror for cause or use a peremptory strike to remove her from the jury venire, and Juror ultimately sat as a juror during the trial. After the jury was selected, Trial Counsel passed on the jury for cause.

¶11     During his opening statement, the prosecutor referred to Betty as "the victim," stating that the blood on the knife "belonged to the victim, [Betty]." Trial Counsel likewise referred to Betty as a "victim" during his opening, stating that the prosecutor was only relaying one side of the story, i.e., "what his victim said."

¶12    In support of its case-in-chief, the State called various witnesses, including Betty, who testified about the events as described above. Before cross-examining Betty, Trial Counsel informed the court—outside the presence of the jury—that he was going to use a video recording of Betty's police interview as part of his questioning, but that he would be using only certain parts, because there were other parts of the interview that "go into" the rule 404(b) evidence that the court had already ruled was inadmissible. During cross-examination, however, Trial Counsel—apparently by mistake—played for the jury a portion of the video recording in which Betty discussed Carrera's prior violent incidents. In particular, the jury heard Betty say, "He's—he's done this before, like I know you know—I know there was times, because like I said, he—there was, you know, charges of stabbing somebody else."

¶13    The State then called the doctor (Doctor) who examined Betty's injuries at the hospital. When Betty arrived at the hospital, the wound on her neck "was not actively bleeding" and "appear[ed] to be superficial." By the time Doctor saw her, he observed "some blood dripping down" from the wound, and had some concern, due to the location of the wound, that Betty might have sustained damage to the underlying structures in the neck, including the jugular vein and the carotid artery. Upon closer inspection, however, Doctor discovered that the cut—described as being one to one-and-a-half centimeters in length and two to three millimeters in depth—"was not at a depth where it would injure those structures." Doctor testified generally about "cut[s] such as this one," stating that such cuts will "quite possibl[y]" stop bleeding on their own, but that "it's also very possible that if left untreated, [such a cut] could continue to bleed to the point where it could threaten someone's life" and that "[u]nder the right circumstances" such a cut could conceivably "threaten someone's life." With regard to Betty's specific cut, however, Doctor testified that it did not require stitches and was ultimately treated just with antibiotic ointment and a bandage. And on cross-examination,

Doctor acknowledged that "this particular slice to the neck was not . . . life threatening." Doctor also described the puncture wound to Betty's shoulder as "superficial."

¶14    Also on cross-examination, Trial Counsel asked a set of questions apparently designed to elicit testimony from Doctor that he was not making a medical diagnosis that Betty had been sexually assaulted, but instead was merely taking Betty at her word that an assault had occurred. Doctor acknowledged that he based his medical examination on what Betty reported. In connection with this line of questioning, Doctor testified that Betty's consistency in relaying her experience to Doctor "caused [him] to believe her story." Then, during redirect examination, the State engaged in the following exchange with Doctor:

> Q:    Was there anything in your exam that led you to believe that [Betty] was not telling the truth?
>
> A:    No.
>
> Q:    Okay. In fact, there was evidence that suggested to you that she was in fact telling the truth, correct?
>
> A:    Yes, there was.

¶15    The State also called a law enforcement officer (Officer) who testified about her involvement in the case. During his cross-examination of Officer, Trial Counsel again referred—six times—to Betty as "the victim," and Officer, in response, referred to Betty as "the victim" three times.

¶16    Also during its case-in-chief, and in an apparent effort to speed up the trial, the State offered to present Deputy's testimony via proffer instead of having him testify in person. Trial Counsel

stipulated to this procedure, and the State made the following proffer:

> So we have agreed that [Deputy] is not going to be testifying to help condense things and wrap things to an end more quickly. So the stipulated proffer is this, that if called to testify he would state on the date of [Carrera's arrest], he showed up that morning in response to a call, that he first went to the home of [Betty's] father, and then he went to the home of [Betty]. There he met [Officer] who then went with him into the home . . . and apprehended [Carrera].

> On top of that, he would testify that he transported [Carrera] to the corrections facility, that he attempted to interview [Carrera]. [Carrera] declined. Then he went to the hospital, interviewed [Betty], and then went back and executed a warrant on the vehicles and finished up also with the warrant of taking a blood draw from [Carrera]. I believe that's the proffer.

Trial Counsel then indicated that he accepted the proffer.

¶17 The next day, the State offered the following additional testimony of Deputy by proffer:

> So your Honor, ladies and gentlemen, in my haste to speed things up and save a little time, as I was making the proffer yesterday I did omit one crucial fact, and I have a stipulation from the parties that in addition to [Deputy's] other testimony, he would have also testified that upon apprehending [Carrera] at [Betty's] home, that during the course of questioning [Carrera] about what happened, [Carrera] stated that he could not remember

anything from the night before after Mesquite. That
would be [Deputy's] testimony.

Trial Counsel also stipulated to this additional proffer.

¶18    For his part, Carrera testified in his own defense and gave
a much different account of the evening's events than Betty had.
Carrera stated that he and Betty had a positive relationship up
until their baby was born, but offered his view that "women
change when they have babies," and that Betty became more
irritable after the birth of their son. He testified that on the night
of the events in question, Betty had more to drink than he did, and
that on the ride back to her mother's house from the casinos, the
two were arguing about Carrera's gambling and moving out of
Betty's home. He acknowledged that, on the drive back to
Milford, he asked Betty about her involvement with Coworker,
but he testified that it was Betty's idea to drive to Coworker's
house because Betty wanted to have Coworker tell Carrera that
nothing untoward was going on.

¶19    Carrera also testified that, upon arriving at Coworker's
house, he refused to allow Betty to approach Coworker's door.
Carrera acknowledged driving up a canyon but testified that,
while in the canyon, Betty got upset with him and got out of the
truck and "started walking." He stated that, after Betty returned
to the truck, she took off her clothes and stated, "I want to have
sex while you're driving." Carrera testified that he declined
Betty's invitation, and that she again became upset with him. He
stated that, after they returned home, it was Betty's idea to drink
shots of tequila. But according to Carrera, after Betty took her first
shot, "she started gagging and blood was suddenly all over the
counter." He stated that Betty appeared unconcerned about the
blood coming from her neck and refused to go to the hospital, and
stated that he does not know how Betty got the cut and that he
"never" held a knife to her neck. Carrera testified that Betty then

made her way to the bedroom, where she initiated consensual sexual activity with him.

¶20 During closing argument, while discussing Carrera's version of events, the prosecutor stated that if Betty had actually cut herself on the neck "[s]he would have had to have tricked a medical doctor." The prosecutor also referred to Betty as "the victim" approximately eight times during his closing argument. Even Trial Counsel referred to Betty as a "victim" once during his closing argument.

¶21 The jury ultimately found Carrera guilty as charged on all sixteen counts and additionally found that, "during the course of the commission of the aggravated kidnapping," Carrera had caused "serious bodily injury" to Betty. Carrera was then sentenced to various prison terms, including life in prison without the possibility of parole on the aggravated kidnapping count.

ISSUES AND STANDARDS OF REVIEW

¶22 Carrera now appeals and presents three issues that require our consideration.[5] First, Carrera asserts that the trial court committed plain error when it submitted two of the three forcible sodomy counts to the jury. Second, Carrera argues that the court again committed plain error by submitting to the jury the serious bodily injury enhancement regarding the aggravated kidnapping charge. "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to

---

5. Carrera also raises other issues not listed in this paragraph, including a request for a remand pursuant to rule 23B of the Utah Rules of Appellate Procedure. We need not reach the merits of those other issues in light of our resolution of the three listed issues. We do, however, briefly discuss one additional issue—the propriety of holding this trial in Beaver County—later in this opinion. *See infra* note 13.

the [trial] court; and (iii) the error is harmful." *State v. Hedgcock*, 2019 UT App 93, ¶ 11, 443 P.3d 1288 (quotation simplified).

¶23    Third, Carrera asserts that Trial Counsel, in various ways, rendered constitutionally ineffective assistance. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Beckering*, 2015 UT App 53, ¶ 18, 346 P.3d 672 (quotation simplified).

ANALYSIS

I.  Forcible Sodomy

¶24    The State charged Carrera with three counts of forcible sodomy. The parties agree that the first count concerned Betty's allegation that Carrera performed unwanted oral sex on her and that the second count concerned Betty's allegation that Carrera attempted to insert his penis into Betty's anus without her consent. With regard to the third count, the parties are both at a loss to explain what that count was for, and the State acknowledges that no evidence supporting any such third count of forcible sodomy was presented at trial.

¶25    We need not concern ourselves with the first count, because Carrera's challenge, as concerns the forcible sodomy charges, is limited to the second and third counts: that is, he agrees that there was enough evidence presented at trial to support a conviction on the first count.

¶26    And we need not spend much time discussing the third count either. With regard to that mysterious count, the State does not contest Carrera's challenge on appeal. That is, the State acknowledges that it presented no evidence supporting a third count of forcible sodomy at trial, and it agrees with Carrera that—

in light of the absence of evidence—the trial court plainly erred by submitting that count to the jury for its consideration.[6] On this basis, the State stipulates "that one of Carrera's convictions for forcible sodomy should be vacated."

¶27 Thus, the only disagreement between the parties regarding the forcible sodomy counts concerns the second one—the one regarding Betty's allegation that Carrera attempted to insert his penis into her anus. Carrera contends that insufficient evidence supports his conviction on that count, and asserts that the trial court plainly erred by submitting this count to the jury. Specifically, Carrera asserts that the State presented insufficient evidence at trial that his penis actually touched Betty's anus.

¶28 Under Utah law, a person commits forcible sodomy when that person engages in "any sexual act with a person who is 14 years of age or older involving the genitals of one person and mouth or anus of another person, regardless of the sex of either participant," and does so without the other individual's consent. *See* Utah Code Ann. § 76-5-403(1), (2) (LexisNexis 2017).[7] Thus, to

---

6. The State's concession on this point necessarily includes an acknowledgment that, even in the absence of any objection by the defendant, it is possible for trial judges to commit reversible error by allowing charges supported by insufficient evidence to be submitted to the jury. Thus, even the State agrees that trial judges, in criminal cases, have at least some affirmative gatekeeping role to play in assessing whether the evidence is sufficient to support the charges levied by the State. The scope of this role is further discussed in other sections of this opinion.

7. This statute has been subject to some recent amendments that are immaterial to this case. In this opinion, we cite to the 2017 version of the relevant statutes, which is the version that was in effect at the time of the events giving rise to this case. *See State v.*

(continued…)

secure a conviction for forcible sodomy, the State must present evidence that, among other things, the genitals of one individual touched the mouth or anus of another individual. But importantly, "any touching, however slight, is sufficient to constitute the relevant element of the offense." *See id.* § 76-5-407(2)(b)(iii).

¶29 In assessing a sufficiency of the evidence challenge, even outside the plain error context, we will reverse only where "the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *State v. Jok*, 2021 UT 35, ¶ 17, 493 P.3d 665 (quotation simplified). And where, as here, a defendant is claiming plain error in relation to his sufficiency of the evidence challenge, the defendant must also show that "the insufficiency was so obvious and fundamental that the [trial] court erred in submitting the case to the jury." *State v. Blais*, 2020 UT App 4, ¶ 10, 458 P.3d 1143 (quotation simplified). Applying this standard, we conclude that the trial court did not plainly err by submitting the second forcible sodomy count to the jury.

¶30 At trial, Betty testified that, at one point in the evening, Carrera undid his pants and attempted "to insert his penis into [her] anus." When the prosecutor began to ask a question that started with "[c]ould you feel . . . ," Betty quickly replied that Carrera "didn't fully . . . I kind of stopped him." The prosecutor then asked, "[c]ould you feel his penis as he was trying to force it inside of you?", to which Betty responded affirmatively.

¶31 We acknowledge Carrera's point that Betty did not *expressly* state that Carrera's penis touched her anus. But she did

---

*Stewart*, 2011 UT App 185, ¶ 1 n.1, 257 P.3d 1055 (stating that "we cite to the version of the statute in effect at the time the crimes were committed").

state that her anus was the particular body part into which Carrera tried to insert his penis, and she testified that she could feel his penis as Carrera was trying to force it inside of her, even if Carrera "didn't fully" insert it. While this testimony could perhaps have been clearer, we cannot say that the insufficiency of the State's evidence that Carrera touched Betty's anus with his penis was "obvious and fundamental" enough to obligate the trial court to intervene, sua sponte, and take the issue from the jury. *See Blais*, 2020 UT App 4, ¶ 10 (quotation simplified). Accordingly, the trial court did not commit plain error in submitting the second forcible sodomy count to the jury.

¶32    We therefore reject Carrera's argument regarding the second forcible sodomy count, but we vacate Carrera's conviction on the third count of forcible sodomy and remand with instructions for entry of acquittal on that count.

## II. Serious Bodily Injury[8]

¶33    The jury, as part of its verdict, not only convicted Carrera of aggravated kidnapping, but it also found—in connection with that charge—that Carrera caused Betty to sustain a "serious bodily injury." Although Carrera does not challenge the sufficiency of the evidence supporting the jury's determination that he committed aggravated kidnapping, he does challenge the sufficiency of the evidence supporting the jury's finding that, in the course of that kidnapping, he inflicted a "serious bodily injury" upon Betty. But because he did not make a motion for directed verdict on that issue, he asks us to review the issue for plain error, asserting that the trial court plainly erred by allowing that issue to be submitted to the jury. The jury's finding of "serious bodily injury" was important, because it was the thing

---

8. This section functions as a dissenting opinion, with Judge Harris writing only for himself. The opinion of the court as to this issue is set forth in Justice Hagen's separate opinion.

that raised the ceiling on Carrera's sentence to life in prison without the possibility of parole.

¶34 Under Utah law, a person commits "kidnapping" if the person "intentionally or knowingly, without authority of law, and against the will of the victim . . . detains or restrains the victim for any substantial period of time." Utah Code Ann. § 76-5-301(1)(a) (LexisNexis 2017). A kidnapping becomes an *aggravated* kidnapping if, as relevant here, the perpetrator "uses, or threatens to use a dangerous weapon" during the kidnapping. *Id.* § 76-5-302(1)(a). A knife can be a "dangerous weapon" for purposes of this statute. *See, e.g., State v. Berriel*, 2011 UT App 317, ¶ 12, 262 P.3d 1212, *aff'd*, 2013 UT 19, 299 P.3d 1133; *State v. Kerr*, 2010 UT App 50, ¶ 5, 228 P.3d 1255.

¶35 A person convicted of aggravated kidnapping is subject to various possible sentences, depending on certain variables. *See* Utah Code Ann. § 76-5-302(3), (4). The base sentence is fifteen years to life, which is raised to "life without parole" if, during the course of the kidnapping, the defendant causes "serious bodily injury to another." *Id.* § 76-5-302(3)(a), (b). Thus, without a finding of "serious bodily injury," the maximum sentence that could have been imposed upon Carrera for aggravated kidnapping would have been fifteen years to life. *Id.* § 76-5-302(3)(a), (4). But *with* a finding of "serious bodily injury," the trial court had the discretion to—and did here—sentence Carrera to a term of life in prison without the possibility of parole. *Id.* § 76-5-302(3)(b).

¶36 "Serious bodily injury" is a term that is defined by statute. Our legislature has decreed that, in this context, "serious bodily injury" is "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death." *Id.* § 76-1-601(11). In this case, the State makes no claim that Carrera injured Betty in a way that caused "serious permanent disfigurement" or "protracted loss or impairment of

the function of any bodily member or organ." Instead, the State directs our attention to the third listed item in the statutory definition, and asserts that Carrera inflicted a "bodily injury" on Betty—the cut on her neck—that created a "substantial risk of death."[9] But in my view, the State's assertion is not borne out by the evidence presented at trial.

¶37 The cut on Betty's neck simply did not create a substantial risk of death to Betty. The cut was only one to one-and-a-half centimeters in length and two to three millimeters in depth, and it had stopped bleeding—twice—before Betty received any professional medical attention. At the hospital, the cut was ultimately treated only with antibiotic ointment and a bandage. Although Doctor testified generally that a cut like this one, if left

---

9. In this context, in order for the sentencing enhancement to apply, it is the "injury" inflicted during the kidnapping—and not necessarily the defendant's actions during the kidnapping—that must create "a substantial risk of death." *See* Utah Code Ann. §§ 76-1-601(11), 76-5-302(3)(b) (LexisNexis 2017). In this way, the statutory scheme regarding kidnapping differs from the statutory scheme regarding murder; in the murder context, a defendant who "knowingly engages in conduct which creates a grave risk of death to another and thereby causes the death of another" is subject to prosecution for murder, *see id.* § 76-5-203(2)(c), and a defendant who, in the course of committing a murder, creates "a great risk of death to a person other than the victim" is subject to conviction for aggravated murder, *see id.* § 76-5-202(1)(c); *see also State v. Sosa-Hurtado*, 2019 UT 65, ¶¶ 25–46, 455 P.3d 63. Because the statutory requirements for the sentencing enhancement in the kidnapping context require an examination of whether the *injury* Carrera inflicted created a substantial risk of death, I do not focus on whether any of Carrera's other actions that night—for instance, driving while intoxicated, or holding a knife to Betty's neck—created a great, grave, or substantial risk of death to Betty or anyone else.

untreated, "could continue to bleed to the point where it could threaten someone's life," he clarified that "this particular slice to the neck was not . . . life threatening." The State presented no other evidence tending to indicate that this particular injury created any risk of death to Betty, let alone a substantial one.

¶38    Even if one were to assume, for the purposes of this discussion, that Betty's cut put her at some remote or infinitesimal risk of bleeding to death, the statutory command must be interpreted as a whole, and that command includes the word "substantial." *See id.* § 76-1-601(11). The legislature has not defined the word "substantial" for use in this context, and in such situations courts interpret statutory language "according to the plain meaning of [its] text." *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465 (quotation simplified). "Dictionaries, other sections of the Utah Code, judicial opinions, and treatises may be useful tools in this endeavor." *Muddy Boys, Inc. v. Department of Com.*, 2019 UT App 33, ¶ 16, 440 P.3d 741 (quotation simplified). Dictionaries indicate that the word "substantial" connotes something "large in size, value, or importance." *See Substantial*, Cambridge Dictionary, https://dictionary.cambridge. org/us/dictionary/english/substantial [https://perma.cc/D5T6-AC M5]; *see also Substantial*, Merriam-Webster Dictionary, https://ww w.merriam-webster.com/dictionary/substantial [https://perma.cc /BYS9-9NKF] (stating that "substantial" means "considerable in quantity").

¶39  These dictionary definitions comport with the understanding of the phrase espoused by our supreme court in *State v. Standiford*, 769 P.2d 254 (Utah 1988). In that case, the court explored the differences between a "grave risk of death"—the phrase used in the "depraved indifference" murder statute—and a "substantial and unjustifiable risk of death"—the phrase used in the statutory definition of recklessness, and which applied to manslaughter charges. *Id.* at 263–64. The court noted that, linguistically, "there is no meaningful difference between" the

two phrases, but concluded that legally, there had to be a difference, because one led to a more serious conviction than the other. *Id.* The court thus held that a "'grave risk of death' means a *highly likely probability* that death will result," while a "substantial and unjustifiable risk of death" means something less than that. *Id.* at 264. But given the close linguistic relationship between the two phrases, I read *Standiford* as instructing us that a "substantial risk of death" means something close to—but not quite the same thing as—a "*highly likely probability* that death will result." *See id.* Indeed, other courts considering the meaning of the phrase "substantial risk" in similar contexts have construed it to mean "risks so great that they are almost certain to materialize if nothing is done." *See Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005) (quotation simplified).

¶40    The neck wound Betty sustained did not create this sort of risk of death, even if one assumes that it created at least some non-zero risk of death. The small cut Betty sustained contrasts sharply with the sort of injuries that, in other cases, have been considered to generate at least a jury question about whether they created a substantial risk of death. *See, e.g.*, *State v. Bloomfield*, 2003 UT App 3, ¶¶ 17–18, 63 P.3d 110 (concluding that sufficient evidence existed to support a finding of "serious bodily injury" where the victim was "severely beaten" to unconsciousness and had his head "kicked and stomped," which resulted in a head contusion, among other injuries); *State v. Poteet*, 692 P.2d 760, 764 (Utah 1984) (upholding a finding of "serious bodily injury" where the victim was "beaten so badly that he did not regain consciousness for 15 to 18 hours after the assault" and the treating physician at trial testified that he "very well could have died" (quotation simplified)); *State v. King*, 604 P.2d 923, 925–26 (Utah 1979) (holding that sufficient evidence existed to support a finding of "serious bodily injury" where the victim "was choked into unconsciousness and stabbed with a pair of scissors" in the chest, resulting in a punctured lung). While the term "substantial risk of death" may not lend itself to a precise definition, I am quite

comfortable concluding that Betty's injury, as described at trial, did not create any such risk.[10]

¶41  I recognize that, due to Trial Counsel's failure to make a motion for directed verdict on this point, this court is reviewing the trial court's actions for plain error. And I also recognize that expecting trial judges to be ready to step in and take matters from a jury, in the absence of a motion or objection from any party, runs counter to our adversarial-based system and perhaps even to judges' usual expectations. *See State v. Holgate*, 2000 UT 74, ¶ 14, 10 P.3d 346 ("As a general rule, to ensure that the trial court addresses the sufficiency of the evidence, a defendant must request that the court do so."). But plain error review exists in criminal cases for good reason: in such cases, an individual's personal liberty is at stake. Indeed, "plain error review first developed in criminal cases involving the life and liberty of the citizen, such as capital cases and cases of grave and serious charged offenses and convictions of long terms of imprisonment," and was eventually extended to "all" criminal cases "due to the significant liberty interests at stake in such cases." *See Kelly v.*

---

10. The State resists this conclusion, in part, by relying on *State v. Anh Tuan Pham*, and its declaration that "it is within the province of the jury to consider the means and manner by which the victim's injuries were inflicted along with the attendant circumstances in determining whether a defendant caused serious bodily injury." 2016 UT App 105, ¶ 22, 372 P.3d 734 (quotation simplified). But just five paragraphs later, we also held in *Anh Tuan Pham* that we will vacate a defendant's conviction due to insufficiency of the evidence "if we determine that the evidence is so inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt as to whether the defendant committed the crime of which he or she was convicted." *Id.* ¶ 27. And here, in my view, no reasonable jury could have concluded, on the evidence presented at this trial, that Betty's cut created a substantial risk that she could bleed to death.

*Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 42, 507 P.3d 357 (quotation simplified). Those policies are certainly implicated here, where the "serious bodily injury" finding is the factor that raised the ceiling on Carrera's possible sentence from fifteen years to life up to life in prison without the possibility of parole. Trial judges in criminal cases have a perhaps-rarely-invoked but nevertheless important role to play—even in the absence of a motion or an objection—in assessing the sufficiency of the charges and enhancements that are submitted to the jury. *See* Utah R. Crim. P. 17(o) ("At the conclusion of the evidence by the prosecution, or at the conclusion of all the evidence, the court may issue an order dismissing any information or indictment, or any count thereof, upon the ground that the evidence is not legally sufficient to establish the offense charged therein or any lesser included offense."). Indeed, our supreme court has instructed that, "even when a defendant fails to move the court for relief based on the sufficiency of the evidence," the court "'shall'" nevertheless "grant relief when the evidence is insufficient, . . . but only when the evidentiary defect is 'apparent' to the trial court." *Holgate*, 2000 UT 74, ¶ 15 (quoting Utah Code section 77-17-3, which provides that a trial court "shall forthwith order" a defendant "discharged" if "it appears to the court that there is not sufficient evidence to put a defendant to his defense").

¶42     On this record, the evidence was insufficient to support the jury's finding that Betty sustained a "serious bodily injury." And in my view, "the insufficiency was so obvious and fundamental that the [trial] court erred in submitting the [issue] to the jury." *See State v. Blais*, 2020 UT App 4, ¶ 10, 458 P.3d 1143 (quotation simplified); *see also Holgate*, 2000 UT 74, ¶ 17 (stating that "the trial court plainly errs if it submits the case to the jury and thus fails to discharge a defendant when the insufficiency of the evidence is apparent to the court"). It should have been apparent to the court that this particular cut did not create anything close to a "substantial risk of death." Not only did the sole medical professional to testify about the injury state that it was a

"superficial" cut that was "not life threatening" and needed treatment only with the equivalent of Neosporin and a Band-Aid, the trial court also had the chance to observe photographs of the injury that were taken on the day of the incident and that were admitted into evidence. I include one of those photographs here— taken upon Betty's arrival at the hospital—to illustrate that the non-life-threatening nature of this cut should have been apparent:



¶43   The majority concludes that it wasn't necessarily "apparent" to the trial court that this cut was not a "serious bodily injury" that created a "substantial risk of death." It points to evidence that the cut bled a lot and soaked through a pair of shorts that Betty used to apply pressure to her neck. And it points to Doctor's testimony that, if such cuts go completely untreated, it is conceivable that they could lead to enough blood loss to cause death. But there is no evidence that Carrera ever tried to prevent Betty from applying pressure to the cut, or that Betty was ever in a position where she was mentally or physically unable to attend to it. And when such cuts are attended to, they do not lead to any

risk of death, let alone a "substantial" one, because they are simply and easily dealt with, without the necessity of any professional medical treatment. Indeed, the only "treatment" such wounds require is quite simple: apply pressure until you can find a Band-Aid. Any person who has lived on this planet for longer than a few months has sustained cuts like this. And it is well within the ken of human experience to know that cuts like this do not create a substantial risk of death, under any meaningful definition of the word "substantial."

¶44    The majority also worries that finding plain error here would "eliminat[e] the distinction between preserved and unpreserved sufficiency claims arising from jury trials." *See infra* ¶ 104. The majority—citing *Holgate,* 2000 UT 74, ¶ 17—is apparently under the impression that the *only* situation in which an evidentiary insufficiency can be "apparent" to a trial court is a situation in which there is literally no evidence to support a conviction. But this is not what our supreme court said in *Holgate*. There, the court observed that "it is difficult" for an appellate court "to dictate when an evidentiary defect was apparent to the trial court," but stated that "there is a certain point at which an evidentiary insufficiency is so obvious and fundamental that it would be plain error for the trial court not to discharge the defendant." *Id.* By way of example, the court offered a "case in which the State presents *no* evidence to support an essential element of a criminal charge." *Id.* But that was just an example; there is no indication, in *Holgate* or anywhere else, that the plain error exception is limited to cases in which there is literally no evidence to support the conviction.

¶45    And I consider the majority's concerns about eliminating the distinction between the two parts of the plain error test to be somewhat overwrought. As the majority itself acknowledges, "in the twenty-two years since *Holgate* was decided," Utah appellate courts "have yet to identify . . . a circumstance" in which "the insufficiency of the evidence would be 'apparent'" to a trial

court. *See infra* ¶ 96. Given this, it seems to me that the greater concern—based on twenty-two years of appellants striking out—is that we might be interpreting our test too strictly. In my view, that is what the majority is doing here. After all, if the insufficiency of the evidence in this case is not considered "apparent" to the trial court, I am hard-pressed to imagine a situation (other than the complete absence of evidence) in which it ever would be. But that can't be right, given that our supreme court has never narrowed the test simply to "no evidence" cases, and given the statutory mandate commanding trial courts to "discharge[]" defendants whenever "it appears to the court that there is not sufficient evidence." *See* Utah Code Ann. § 77-17-3 (LexisNexis 2017).

¶46 The injury to Betty's neck was a minor cut that, by way of treatment, needed only pressure, antibiotic ointment, and a bandage. It had stopped bleeding twice even before Betty sought medical attention. The only medical professional to testify about the injury stated that it "was not . . . life threatening." And yet the jury's decision to construe this cut as a "serious bodily injury" was the only thing that made Carrera eligible for a sentence of life in prison without the possibility of parole. Under these circumstances, the elements of plain error are met: it should have been obvious to the court that this injury fell short of creating a substantial risk of death, and the court's error prejudiced Carrera by leading to a significant increase in his sentence.

¶47 For the reasons discussed below relating to the ineffectiveness of Trial Counsel, we vacate Carrera's entire conviction for aggravated kidnapping. But if Carrera is re-tried on that charge, in my view the "serious bodily injury" sentencing enhancement should not be submitted to the jury, because the State did not produce sufficient evidence to establish beyond a reasonable doubt that Carrera caused any such injury to Betty.

### III. Ineffective Assistance of Counsel

¶48 Finally, Carrera asserts that Trial Counsel rendered constitutionally ineffective assistance. To succeed on this claim, Carrera must make a two-part showing: (1) that Trial Counsel's performance was deficient in that it "fell below an objective standard of reasonableness," and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871.

¶49 Carrera asserts that Trial Counsel was ineffective in various particulars, four of which require our attention here: (1) Trial Counsel's failure to object to the presence of an actually biased juror on the jury; (2) Trial Counsel's presentation, to the jury, of the portion of Betty's police interview in which she mentioned Carrera's previous bad acts; (3) Trial Counsel's participation in eliciting, and failure to object to, Doctor's testimony vouching for the veracity of Betty's account of the relevant events; and (4) Trial Counsel's participation in, and failure to object to, referring to Betty as "the victim." We first address whether Trial Counsel performed deficiently in these four particulars, and conclude that he did. We then discuss whether Carrera was prejudiced by Trial Counsel's deficient performance.

#### A. Deficient Performance

¶50 The first part of the test requires Carrera to show that Trial Counsel's performance "fell below an objective standard of reasonableness." *Scott*, 2020 UT 13, ¶ 31 (quotation simplified). In evaluating the reasonableness of counsel's actions, courts will often look to whether the actions counsel took were motivated by trial strategy. *See id.* ¶ 35 ("To be sure, the performance inquiry will often include an analysis of whether there could have been a

sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *see id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *Ray*, 2020 UT 12, ¶ 34.

1

¶51 Carrera first contends that Trial Counsel performed deficiently by allowing an actually biased juror to sit on the jury. Although we acknowledge that decisions about whether, and when, to deploy for cause and peremptory challenges to potential jurors are often made for strategic reasons, we agree with Carrera that, in this situation, Trial Counsel performed deficiently by not challenging Juror's participation.

¶52 While proving ineffective assistance of counsel is never particularly easy, in the jury selection context a defendant's task is even more daunting than usual. In particular, the law requires courts "to make two distinct presumptions when trial counsel does not object to, or remove, a particular juror." *State v. Litherland*, 2000 UT 76, ¶ 20, 12 P.3d 92. First, counsel's actions with regard to any particular juror are "presumed to be the product of a conscious choice or preference." *Id.* "Second, because the process of jury selection is a highly subjective, judgmental, and intuitive process, trial counsel's presumably conscious and strategic choice to refrain from removing a particular juror is further presumed to constitute effective representation." *Id.* Our supreme court has noted that these presumptions are necessary "because jury selection is more art than science," and because "[t]here are a multitude of inherently subjective factors typically constituting the sum and substance of an attorney's judgments about prospective jurors." *Id.* ¶ 21. As a result, "because *Strickland* requires the presumption that trial counsel's strategic decisions

are reasonable, and because trial counsel is justified in relying on little more than subjective preference for retaining a particular juror, it follows that the decision not to remove a particular juror need only be plausibly justifiable." *Id.* ¶ 25 (quotation simplified). Thus, an "appellate court will presume that counsel's lack of objection to, or failure to remove, a particular juror was the result of a plausibly justifiable conscious choice or preference." *Id.*

¶53    But this presumption is rebuttable, and a defendant may accomplish this task by demonstrating, among other things, "that a prospective juror expressed bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove that juror." *Id.* Under the rather unique circumstances presented here, we conclude that Carrera has rebutted the presumption, and has made the necessary showing that Trial Counsel performed deficiently by not challenging Juror's presence on the jury.

¶54    During jury selection, Juror made it known that Deputy—one of the primary law enforcement investigators in the case, and who was scheduled to testify at trial—was married to her cousin. The court then asked Juror if she would give more weight to Deputy's testimony because she was familiar with him. Juror responded affirmatively, and indicated that she would give his testimony more weight "because I trust him."[11] With this

_____

11. Earlier in the jury selection process, Juror had indicated that she knew Betty, and to further explore that relationship, Juror was taken into chambers for follow-up questioning. There, Juror stated that she was friends with Betty's sister and thus knew Betty from school, and in addition had played on the same softball team with Betty, but stated that Betty was more "like an acquaintance" than a friend. Juror also stated that she had heard "a rumor" about "what may have happened between" Betty and Carrera. In chambers, Juror was asked whether she "could be fair" despite

(continued…)

statement, Juror clearly expressed a bias in favor of Deputy, one of the State's scheduled witnesses.

¶55 The first question we must confront is whether this sort of bias—in favor of a witness as opposed to a party—is the sort of bias that counts as a "strong or unequivocal" bias for purposes of our inquiry. *See id.* We conclude that it is.

¶56 Our supreme court has determined that the sort of bias that raises concern in this context is not limited to "bias in favor of or against the prosecution, or in favor of or against the defendant," but includes any "bias that would interfere in any manner with a juror's deciding evidentiary issues fairly and objectively and applying objectively the rules of law given to the jury by the trial judge." *State v. Saunders*, 1999 UT 59, ¶ 44, 992 P.2d 951. And in *Hughes v. United States*—a case cited favorably as "well-reasoned authority" by our supreme court, *see State v. King*, 2008 UT 54, ¶ 18, 190 P.3d 1283—the court concluded that "actual bias" was present on facts similar to those presented here. *See Hughes*, 258 F.3d 453, 459–61 (6th Cir. 2001). In *Hughes*, a prospective juror stated that she had "a nephew on the police force" in a nearby town, that she was "quite close" to "a couple of detectives," and that as a result she did not think she could be fair in evaluating testimony from police officers. *Id.* at 456. The court found this to be the sort of bias that qualified as "actual bias" for purposes of evaluating counsel's effectiveness in failing to strike the juror. *Id.*

---

her "acquaintance" with Betty and the rumors she had heard, and she said she "would hope that [she] wouldn't be biased" and told the court that she "would listen to both sides and . . . would make good judgments." Juror was then taken back into the courtroom and, a few minutes later, was asked about her relationship with Deputy. But perhaps because of the clarity of her statement that she would give more weight to Deputy's testimony, she was not asked, by way of follow-up, whether she could be fair and impartial, notwithstanding her relationship with Deputy.

at 459–61. The court considered it to be "a clear inference that a person whose nephew is a member of a local police force, and who is 'quite close' to a few detectives, would be biased *against* a defendant who was said to have stolen a government firearm from a federal marshal at gunpoint." *Id.* at 460.

¶57   We acknowledge that, in this case, the crime was not committed against a law enforcement officer, as was the case in *Hughes*. But in *Hughes*, the juror did not actually know any of the government's witnesses personally; her bias was in favor of law enforcement officers generally. *Id.* at 456. In this case, by contrast, Juror was personally acquainted with and related to Deputy, a law enforcement witness who was scheduled to testify at trial. And Juror's unequivocal answers to the court's questions— particularly her statement that she "trust[ed]" Deputy and would give more weight to his testimony than she would to someone else's—demonstrated an acknowledged inability to assess Deputy's testimony in an impartial, evenhanded way. On these facts, we have no trouble concluding that Juror's bias is the sort of "strong and unequivocal" bias that is of concern in this context.

¶58   And we cannot imagine any plausible countervailing subjective preference that, in these circumstances, would operate to justify Trial Counsel's failure to challenge Juror. *See Litherland*, 2000 UT 76, ¶ 25. There is no indication, from any of Juror's answers to the court's questions, that Juror possessed any other characteristics or experiences that might have made Trial Counsel think that, despite her clearly stated bias toward Deputy, she would somehow nevertheless have been likely to be a pro-defense juror, or that she would have been impartial despite her statement that she could not be.[12] Not even the State attempts to offer a

---

12. Indeed, the only other things the record reveals about Juror are that she is a stay-at-home mom who coaches girls' basketball, and that she was acquainted with Betty due to playing on the same

(continued…)

plausible countervailing reason why Trial Counsel might have decided to leave Juror on the jury despite her clearly stated bias.

¶59　We recognize that, under our supreme court's recent articulation of the ineffective assistance of counsel standards, our inquiry does not end simply because we cannot come up with a plausible strategic reason for an attorney's actions. *See State v. Ray*, 2020 UT 12, ¶¶ 34–36, 469 P.3d 871. We must also consider whether, even in the absence of any strategic or tactical objective, a reasonable attorney might have forgone an objection to Juror's participation. And on this record, we conclude that a reasonable attorney would not have forgone an objection to Juror. Deputy was scheduled to testify about his interactions with Carrera on the morning Carrera was arrested, and was anticipated to offer testimony about things Carrera said—and did not say—in the wake of his arrest. A reasonable attorney should have known that Deputy's account would differ, in at least some material respects, from the account Carrera planned to offer. In our view, it was objectively unreasonable not to resist the seating of Juror.

¶60　For these reasons, we conclude that Trial Counsel performed deficiently by failing to challenge Juror's participation in Carrera's trial.[13]

---

softball team and from being friends with Betty's sister. These facts appear to cut in the State's favor, and do not appear to give rise to a plausible countervailing strategic theory for keeping Juror on the jury despite her stated bias in favor of Deputy.

13. Juror was not the only potential juror who was related to, or closely acquainted with, one or more participants at the trial, or who had heard "rumor[s]" circulating in the community about the case. After all, Beaver County is a relatively small community, containing some 7,000 residents. *See* QuickFacts, Beaver County,

(continued…)

2

¶61 Carrera next asserts that Trial Counsel performed deficiently by allowing the jury to view a video recording of Betty describing some of the very rule 404(b) evidence that the trial court had already decided was inadmissible. We agree.

¶62 Our rules of evidence state that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). Such evidence can be admitted for another purpose, however, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). Before trial, the State sought to introduce evidence of certain previous acts Carrera had committed, including evidence that Carrera had, in one incident, brandished a knife at someone and, in another, been charged with stabbing an individual in the

---

Utah, https://www.census.gov/quickfacts/fact/table/beavercount yutah,US/INC110217 [https://perma.cc/P4K6-EWXD]. It is therefore not surprising that some members of the jury pool were acquainted with some of the trial participants. For these and other reasons, Carrera filed a motion, early in the case, asking for a change of venue, pointing out that Betty's family is well-known in the small community and asserting that he was unlikely to receive a fair trial in Beaver County. Carrera appeals the trial court's denial of this motion, but he waived the issue by passing on the jury panel for cause. *See State v. MacNeill*, 2016 UT App 177, ¶¶ 23–25, 380 P.3d 60 (stating that a party who "passed the jury panel for cause" thereby "forfeited any claim of juror bias and with it his challenge to the court's earlier denial of his change-of-venue motion"). Carrera will, of course, be free to renew the motion, on remand, with regard to any new trial that is eventually scheduled, and the court should consider any such motion based on the circumstances as they exist when the motion is brought.

stomach. The trial court denied the State's motion, concluding that any probative value this evidence might have was substantially outweighed by a risk of unfair prejudice.

¶63    Notwithstanding this ruling, during the cross-examination of Betty, Trial Counsel (apparently by mistake) played a portion of Betty's police interview that contained the following statement: "He's—he's done this before, like . . . I know there was times, because like I said, he—there was, you know, charges of stabbing somebody else."

¶64    We conclude that Trial Counsel performed deficiently by allowing the jury to hear this evidence. There is no conceivable strategic reason for allowing this evidence to be presented to the jury; indeed, the whole incident appears to have been a mistake. And we conclude that a reasonable attorney would not have allowed the jury to hear this evidence, especially after successfully resisting the State's efforts to introduce it. Stated another way, Trial Counsel's actions in allowing the jury to hear this evidence "fell below an objective standard of reasonableness." *See State v. Ray*, 2020 UT 12, ¶ 36, 469 P.3d 871.

¶65    The State resists this conclusion by pointing out that Trial Counsel's actions were apparently an honest unintended mistake, and asserting that "[a]ny reasonable attorney could make the same mistake under these circumstances." We acknowledge that no attorney—indeed, no person—is perfect, and that well-intentioned mistakes occur in even the smoothest trials conducted by top-flight lawyers. But Trial Counsel's failure to take steps— especially after successfully moving, prior to trial, to exclude the evidence—to ensure that the parts of Betty's police interview in which she discusses Carrera's prior bad acts never reached the jury was not objectively reasonable. Those steps could have included, among others, editing the video beforehand so that the version of the recording to be used at trial did not even contain the inadmissible portions, or taking steps to better familiarize

himself with the audiovisual technology used in the courtroom.[14] In short, it was objectively unreasonable for Trial Counsel to have allowed this to happen, and we cannot characterize this particular "mistake" as one in keeping with an objective standard of trial competence. To be sure, even competent attorneys make mistakes, but when an otherwise-competent attorney makes a mistake of this magnitude, that attorney has not, in the moment, acted reasonably.

¶66　Accordingly, we agree with Carrera that Trial Counsel performed deficiently when he presented to the jury Betty's statement that Carrera had previously been charged with stabbing someone else.

3

¶67　Next, Carrera asserts that Trial Counsel performed deficiently by helping to elicit, and then not objecting when the State further elicited, statements from Doctor improperly vouching for the veracity of Betty's statements. We agree.

¶68　"Rule 608(a) of the Utah Rules of Evidence prohibits any testimony as to a witness's truthfulness on a particular occasion." *State v. Boyer*, 2020 UT App 23, ¶ 44, 460 P.3d 569 (quotation simplified). And "[w]hile experts may use their expertise to help the factfinder understand issues at trial, experts cannot testify that

---

14. Carrera does not specifically assert that Trial Counsel was ineffective for electing not to seek a curative instruction after the evidence was mistakenly admitted. Such decisions have strategic implications, and we have often held that an attorney does not perform deficiently by failing to seek such an instruction. *See, e.g.*, *State v. Popp*, 2019 UT App 173, ¶ 50, 453 P.3d 657. Accordingly, we focus on Trial Counsel's lack of preparation and his failure to ensure that the inadmissible portions of the video would not be presented to the jury, and not on potential steps Trial Counsel might have taken to correct the mistake after the fact.

a particular witness has or has not told the truth." *Id.* (quotation simplified). In particular, we have classified as inadmissible any claims by experts that they know how to discern lies from truth, or that they have made an evidence-based determination that a witness was telling the truth. *See State v. Burnett*, 2018 UT App 80, ¶¶ 32–36, 427 P.3d 288 (deeming "improper" certain testimony in which an expert witness was portrayed "as an expert in being able to discern truthful sexual abuse allegations from false ones"); *see also State v. Valdez*, 2021 UT App 13, ¶ 55, 482 P.3d 861 (classifying as "improper and inadmissible" certain testimony from a police officer stating "that he believed [the complaining witness] was telling the truth" and that he claimed to be "a sort of human lie detector" able to employ "techniques . . . to ferret out lies").

¶69    In this case, Trial Counsel began his cross-examination of Doctor with a line of questioning apparently designed to get Doctor to acknowledge that he was not making a medical diagnosis that Betty had been sexually assaulted, but instead was merely taking Betty at her word that an assault had occurred. In response, Doctor acknowledged that he based his medical examination on what Betty reported. So far so good. But a few minutes later, Doctor commented on how consistent Betty's story had been across several medical appointments, and Trial Counsel asked Doctor if this consistency "caused [him] to believe her story." Doctor responded in the affirmative, stating that he did believe Betty's story.

¶70    Then, on redirect examination, the State picked up the ball and ran with it, asking Doctor whether there was "anything in [his] exam that led [him] to believe that [Betty] was not telling the truth," to which Doctor replied, "No." The State then asked Doctor to confirm that there was "evidence that suggested to [him] that she was in fact telling the truth," and Doctor replied, "Yes, there was." Trial Counsel did not lodge any objection to the State's questioning in this regard.

¶71    This vouching testimony is inadmissible. *See Burnett*, 2018 UT App 80, ¶¶ 32–36; *Valdez*, 2021 UT App 13, ¶ 55. An objection to this testimony would very likely have been sustained. And while we discern a strategic reason for Trial Counsel to try to get Doctor to acknowledge that he took Betty at her word, that strategy was successfully completed when Doctor provided that acknowledgment. Trial Counsel's decision to later ask whether Betty's consistency "caused [Doctor] to believe" Betty was not in furtherance of this strategy, and gave Doctor an opportunity to offer an opinion regarding Betty's credibility. And the testimony the State elicited on redirect—that the reason Doctor believed Betty was because there was "evidence" supporting the conclusion that she was telling the truth—was the sort of "human lie detector" testimony that is subject to objection. *See Valdez*, 2021 UT App 13, ¶ 55. We perceive no strategic reason for Trial Counsel to have forgone an objection to that testimony.

¶72    We conclude that it was objectively unreasonable for Trial Counsel to have continued the line of questioning after eliciting the acknowledgement from Doctor that he had taken Betty at her word, and it was objectively unreasonable for Trial Counsel to have asked Doctor whether he believed Betty's story. It was also objectively unreasonable for Trial Counsel to have forgone an objection to the State's questioning on redirect, given the testimony's clear inadmissibility and given its potential importance. All of this evidence was quite helpful to the State, and gave the jury one more reason to credit Betty's version of events over Carrera's. For these reasons, we agree with Carrera that Trial Counsel performed deficiently by helping to facilitate, and not objecting to, the vouching testimony offered by Doctor.

4

¶73    Finally, Carrera argues that Trial Counsel performed deficiently by not lodging an objection to the prosecutor's repeated references to Betty as "the victim" and for occasionally

referring to Betty as "the victim" himself. We agree with Carrera that, at a minimum, Trial Counsel's own references to Betty as "the victim" constituted deficient performance.

¶74 Our supreme court has "recognize[d] the gravity of referring to witnesses as victims during a trial." *State v. Vallejo*, 2019 UT 38, ¶ 102, 449 P.3d 39. But our supreme court has not often spoken in this area, and the State asserts that Utah's case law in this area is "in a state of flux," has "only begun to address" the "complexities" presented, and contains instances of "ill-considered dicta." While we acknowledge that some specific questions remain unanswered and that the case law will certainly develop further as time passes, we can distill from our case law—such as it is—several clear principles.

¶75 First, if it is undisputed that the complaining witness was a victim of a crime, then judicial "concern with the use of the term 'victim' during trial is generally low," and "use of the term 'victim' usually will be appropriate, even during trial before the jury has reached a verdict." *See State v. Godinez Juarez*, 2021 UT App 53, ¶ 35, 489 P.3d 231; *see also id.* (offering an illustrative hypothetical "in which a complaining witness was undoubtedly assaulted, as evidenced by obvious physical injuries, and the defendant defends the case not on the ground that no assault occurred but, instead, on the ground that he or she was not the assailant"). But the situation is different in cases where the defendant defends the case "on grounds that no crime was committed and, concomitantly, that there is no victim in the case at all." *Id.* In such cases, "reference to the complaining witness as a 'victim' can be problematic" because "it has not yet been conclusively established, prior to the verdict, that there is in fact a victim," and because "use of that term might imply that a crime has been committed." *Id.*; *see also State v. Devey*, 2006 UT App 219, ¶ 17 n.5, 138 P.3d 90 ("[W]e conclude that the term [victim] should be avoided generally in cases where the ultimate issue before the jury is whether any crime actually occurred.").

¶76 Second, even in cases in which there is a dispute about whether a crime occurred, "the identity of the speaker matters." *See Godinez Juarez*, 2021 UT App 53, ¶ 36. For example, our supreme court has identified "improper statements made by the court" as "serious," because they "could give a jury an impression of partiality." *See Vallejo*, 2019 UT 38, ¶ 99 & n.18; *see also Godinez Juarez*, 2021 UT App 53, ¶ 36 (stating that "statements by a trial court are perhaps most concerning, given that juries tend to view statements by the court as neutral and authoritative"). References by prosecutors and law enforcement witnesses are, depending on the context, perhaps less concerning than statements by trial courts, because—as the State sensibly points out—jurors understand that prosecutors and law enforcement witnesses have a point of view oriented toward seeking a conviction, and because law enforcement officers often use the word "victim" as a mere synonym for "complaining witness." *See, e.g.*, *State v. Rodriguez*, 946 A.2d 294, 306 (Conn. App. Ct. 2008) (stating that, when a prosecutor uses the word "victim," "the jury [is] likely to understand that the state's identification of the complainant as the victim reflected the state's contention that, based on the state's evidence, the complainant was the victim of the alleged crimes" (quotation simplified)). But references by prosecutors to the complaining witness as "the victim" are still a matter of some concern, and we urge the State's attorneys and witnesses to avoid making such references when there is a dispute over whether a crime was committed. *See Devey*, 2006 UT App 219, ¶ 17 (stating that the "court, the State, and all witnesses should be prohibited from referring to the complaining witness as 'the victim'").

¶77 We are unaware of any Utah cases discussing references to "the victim" made by a defendant's own attorney. But such references are very concerning, at least in a case where there is a dispute about whether a crime occurred. The defendant's attorney is the one individual in the courtroom tasked with advocating for the defendant's position at trial. We have previously stated that, "where a defendant claims that the charged crime did not actually

occur, and the allegations against that defendant are based almost exclusively on the complaining witness's testimony . . . [,] the trial court, the State, and all witnesses should be prohibited from referring to the complaining witness as 'the victim.'" *Id.* In *Devey*, we did not include "defense attorneys" in that list, but we add them to the list now, and note that, in a case where the defendant disputes that any crime was committed, references by defense counsel to the complaining witness as "the victim" cause us heightened concern. After all, if the defendant's own attorney thinks the complaining witness is a "victim," jurors might wonder why they shouldn't reach a similar conclusion.

¶78 And third, we have noted that "statements referring to the particular complaining witness in the case as a 'victim' often are more concerning than general statements referring to victims of crime across a particular population." *See Godinez Juarez*, 2021 UT App 53, ¶ 36; *see also id.* ¶ 38 (concluding that general statements regarding a "victim interview room" were of little concern).

¶79 In this case, the statements using the term "victim" were numerous, came from several sources (the prosecutor, law enforcement witnesses, and even Trial Counsel), and unsubtly referred to Betty as "the victim."[15] The prosecutor referred to Betty as "the victim" nine times, one of the State's witnesses (Officer) referred to Betty as "the victim" three times, and Trial Counsel

---

15. In addition to these statements, Carrera also complains about references the trial court made while reading the charging document to the jury. But the only references the court made to "the victim" were references embedded in statutory language. *See* Utah Code Ann. §§ 76-5-301, 302 (LexisNexis 2017) (using the term "victim" in the statutory definition of kidnapping). We are untroubled by a court's use of the term "victim" if that use comes while reading the language of the operative statute. We do not consider any such statements in reaching our conclusions in this part of our opinion.

himself referred to Betty as "the victim" some eight times. Carrera defended the case by claiming that the charged crimes did not actually occur (rather than by claiming that someone else had committed them). And the charges were based, in large part, on Betty's testimony. We have little trouble concluding that these references were problematic and objectionable. *See Devey*, 2006 UT App 219, ¶ 17.

¶80 The State asserts that, even if these references were objectionable, a reasonable attorney could have decided to forgo an objection. But even if we presume, for purposes of the discussion, that an objectively reasonable attorney might have chosen not to object when the term was used by the prosecutor and one of the State's witnesses, it was objectively unreasonable for Trial Counsel himself to repeatedly refer to Betty as "the victim" when it directly conflicted with Carrera's defense that no crime had occurred. We therefore conclude that Trial Counsel performed deficiently by repeatedly making references to Betty as "the victim."

B.    Prejudice

¶81 Because we have determined that Trial Counsel rendered deficient performance in four respects, we must now turn to the question of whether that performance prejudiced Carrera. "Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." *State v. Whytock*, 2020 UT App 107, ¶ 28, 469 P.3d 1150. "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In assessing prejudice, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (quotation simplified).

¶82     In this case, Carrera contends that each instance of deficient performance identified above independently prejudiced him. Alternatively, he contends that the combined effects of each error should undermine our confidence in the verdict. Ultimately, we need only consider whether Carrera was prejudiced by Trial Counsel's failure to challenge Juror's participation in the trial, because that error resulted in presumptive prejudice and requires reversal on its own.

¶83     Our supreme court has made clear that "a defendant suffers prejudice when he is denied a fair trial because a biased juror sat on the jury." *See State v. King*, 2008 UT 54, ¶ 18, 190 P.3d 1283. And this principle holds true in ineffective assistance of counsel cases: "When the ineffective assistance of counsel results in the seating of a juror who is actually biased against the defendant, . . . the prejudice required by *Strickland* will be presumed," and there is no need to go through the usual *Strickland* prejudice analysis. *Id.* "The presence of a biased juror, like the presence of a biased judge, is a structural defect in the constitution of the trial mechanism that defies harmless error analysis." *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001) (quotation simplified). For these reasons, "[t]he seating of a biased juror who should have been dismissed for cause requires reversal of the conviction." *Id.*; *see also United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000) (stating that "the seating of any juror who should have been dismissed for cause" is a "circumstance [that] would require reversal"); *King*, 2008 UT 54, ¶ 28 ("This principle of law is grounded in the presumption that the presence of a biased juror so undermines the fairness and impartiality of the verdict that the Sixth Amendment right to a fair trial can be preserved only by setting aside the conviction.").

¶84     As already noted, Juror exhibited actual bias when she stated that she was related to and "trust[ed]" Deputy, and that she would give more weight to his testimony than to another witness's testimony due to her relationship with him. *See supra*

Part III.A.1. But in cases where a juror's bias is for or against a specific witness (rather than for or against a party, or for or against an issue), there remains one additional wrinkle to consider: the juror's bias usually becomes relevant to the case only if the witness's testimony is admitted into evidence. Certainly, if a juror's bias exists only toward a particular witness, and that witness does not end up testifying or playing any role in the trial, any bias toward that witness is unlikely to be relevant. But in this case, Deputy's testimony was admitted into evidence.

¶85 Nevertheless, the State asserts that, because Deputy's statements were admitted by stipulated proffer rather than live testimony, his "credibility was never at issue" and the "potential for bias therefore never ripened into 'actual bias.'" We disagree. Regardless of whether his testimony was admitted by proffer, Deputy's credibility remained at issue because his account differed from Carrera's on a material point, and the jury was being asked to decide whose account to credit. Indeed, in the stipulated testimony, Deputy stated that Carrera, at the time of his arrest, had told him that he could not remember anything about the night in question after Mesquite. Carrera denies making this statement; in fact, when he took the stand in his own defense, he gave a detailed account of what happened on the night in question after Mesquite, an account that differed sharply from the one offered by Betty. According to the prosecutor at trial, Deputy's testimony on this specific point—that Carrera told Deputy that he did not remember anything, after Mesquite, about the night in question—amounted to "a crucial fact," presumably because Deputy's testimony in this regard gave the jury one more reason to think that Carrera's account of events, as recounted at trial, was not true and had been made up after the fact. Thus, in the State's view, whether the jury believed Deputy was important to its case. Generally speaking, when the State indicates that a particular item of evidence is important in its efforts to obtain a conviction, we take that representation at face value. *Cf. State v. Ellis*, 2018 UT 2, ¶ 43, 417 P.3d 86 (stating that one factor leading to the conclusion

that the admission of evidence mattered was that "[t]he prosecution emphasized [it] during closing argument"). We therefore disagree with the State's contention that Deputy's credibility was never at issue.

¶86    Thus, Juror exhibited an actual bias, and not merely a potential bias, regarding a witness whose testimony was admitted at trial and whose credibility was squarely at issue. Accordingly, we conclude that the presumption of prejudice applies here. *See King*, 2008 UT 54, ¶¶ 18, 34. For this reason, Carrera has demonstrated the presence of *Strickland* prejudice on the strength of this issue alone. *See id.* ¶ 18. And with prejudice thus established, we need not proceed to consider the prejudicial effect—cumulatively or otherwise—of the remaining three instances of deficient performance. Carrera has therefore satisfied both parts of the *Strickland* test, and has successfully demonstrated that Trial Counsel rendered constitutionally ineffective assistance that affected all of his convictions.

## CONCLUSION

¶87    The trial court committed plain error by submitting one of the three forcible sodomy charges to the jury. We therefore vacate that conviction and remand with instructions for acquittal on that count.

¶88    And in addition, because Trial Counsel rendered constitutionally ineffective assistance, we vacate Carrera's other convictions, including the conviction for aggravated kidnapping, and remand this case for a new trial or other proceedings consistent with this opinion.

———————

HAGEN, Justice, authored the Opinion of the Court as to Part II, in which Pohlman, J., joined:

¶89　We disagree with Part II of the lead opinion and hold that the trial court did not plainly err by submitting the question of "serious bodily injury" to the jury. The offense of aggravated kidnapping is subject to a sentencing enhancement "if the trier of fact finds that during the course of the commission of the aggravated kidnapping the defendant caused serious bodily injury to another." Utah Code Ann. § 76-5-302(3)(b) (LexisNexis 2017). "Serious bodily injury" is defined as "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death." *Id.* § 76-1-601(11). Here, the State relies solely on the "substantial risk of death" variant. Specifically, the State argues that a reasonable jury could find that the cut to Betty's neck created a substantial risk of death.

¶90　At trial, Carrera did not move for a directed verdict on the question of serious bodily injury. Therefore, we must determine whether the trial court committed reversible error when, without objection, it submitted that question to the jury.

¶91　In general, our adversarial system relies on the parties to identify errors. *See State v. Bond*, 2015 UT 88, ¶¶ 45–46, 361 P.3d 104 (noting that "in our adversarial system the responsibility to detect errors lies with the parties and not the court"). Consequently, if an alleged error is not brought to the attention of the trial court, a party cannot complain of that error on appeal unless the party can demonstrate an exception to the preservation rule. *State v. Griffin*, 2016 UT 33, ¶ 20, 384 P.3d 186. For criminal cases, one recognized exception is plain error.[16] *See generally Kelly*

---

16. The only exception to the preservation rule asserted on appeal was plain error. Because Carrera has not made an ineffective assistance of counsel claim on this issue, we offer no opinion on whether the failure to move for directed verdict on the serious bodily injury enhancement rose to the level of ineffective

(continued…)

*v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶¶ 35–39, 507 P.3d 357 (explaining the basis for plain error review in criminal cases). "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (quotation simplified).

¶92    "As a general rule, to ensure that the trial court addresses the sufficiency of the evidence, a defendant must request that the court do so." *Id.* ¶ 14. However, in *Holgate,* the Utah Supreme Court held that unpreserved sufficiency claims arising from a jury trial can be reviewed for plain error. "[T]he trial court plainly errs if it submits the case to the jury and thus fails to discharge a defendant when the insufficiency of the evidence is apparent to the court." *Id.* ¶ 17. To demonstrate plain error in this context, a defendant must show (1) "that the evidence was insufficient to support a conviction of the crime charged," and (2) "that the insufficiency was so obvious and fundamental that the trial court erred in submitting the case to the jury." *Id.* Even assuming that Carrera has made the first showing, he has not made the second.

¶93    As to the first showing, the lead opinion concludes that the evidence in this case was insufficient to prove that the injury to Betty's neck created a risk of death, much less a substantial risk of death. And whenever we conclude that the evidence was insufficient to prove a particular element, it might appear that the insufficiency should have been apparent to the trial court. But if we equate any instance of insufficient evidence with obvious and

---

assistance of counsel. But the potential availability of an alternative ground for reversal counsels against the need to make the plain error analysis coextensive with the analysis of a preserved sufficiency challenge.

fundamental error, we improperly collapse the two-part inquiry, and we eliminate the distinction between reviewing a preserved sufficiency issue and an unpreserved one. Our supreme court has specifically held that the preservation requirement applies to sufficiency claims arising from jury trials. *See State v. Jok*, 2021 UT 35, ¶¶ 22–23, 493 P.3d 665 (distinguishing bench trials from jury trials). Therefore, there must be a distinction between sufficiency challenges that merit reversal for plain error and those that merit reversal only if the issue has been preserved.

¶94    If the issue in this case had been preserved, we might agree with the lead opinion that the evidence was insufficient to prove serious bodily injury.[17] But it was not preserved. And Carerra has not carried his burden to show that it was plain error for the district court to submit that question to the jury.

¶95    We begin with the presumption that "serious bodily injury" is a jury question. In analogous contexts, we have emphasized that "[w]hether a defendant caused serious bodily injury . . . is a question for the jury to decide based on the facts presented in the case before it." *State v. Walker*, 2017 UT App 2, ¶ 26, 391 P.3d 380 (aggravated assault). Specifically, "[i]t is within the province of the jury to consider the means and manner by which the victim's injuries were inflicted along with the attendant circumstances in determining whether a defendant caused

---

17. It is not necessary to decide whether the evidence of serious bodily injury was insufficient, because that alleged insufficiency was not so obvious or fundamental that the trial court plainly erred by submitting the question to the jury. *See State v. Samples*, 2012 UT App 52, ¶ 14, 272 P.3d 788 ("Because this case comes before us on plain error review, . . . we need not decide whether the evidence was" insufficient, but only "whether the alleged insufficiency of the evidence was such that it was an 'obvious and fundamental' error to submit the case to the jury." (quotation simplified)).

serious bodily injury." *State v. Pham*, 2016 UT App 105, ¶ 22, 372 P.3d 734 (quotation simplified) (unlawful discharge of a firearm); *see also State v. Bloomfield*, 2003 UT App 3, ¶¶ 16–18, 63 P.3d 110 (aggravated robbery); *State v. King*, 604 P.2d 923, 925–26 (Utah 1979) (aggravated sexual assault). In other words, as long as there is some supporting evidence, the jury is entitled to decide whether a particular injury meets the statutory element of "serious bodily injury." In fact, we have reversed a trial court for taking this issue away from the jury. *See Walker*, 2017 UT App 2, ¶¶ 23, 25–26, 42 (reversing a conviction where the trial court instructed the jury that strangulation constitutes "serious bodily injury" and cautioning judges to "take care not to step into the jury's fact-finding shoes"). A trial court rightly should be hesitant to intrude on the province of the jury, particularly in the absence of a defense motion.

¶96 But as *Holgate* recognizes, "there is a certain point at which an evidentiary insufficiency is so obvious and fundamental that it would be plain error for the trial court not to discharge the defendant." 2000 UT 74, ¶ 17. "While it is difficult for the court on appeal to dictate when an evidentiary defect was apparent to the trial court," the *Holgate* court cited as an example "the case in which the State presents *no* evidence to support an essential element of a criminal charge." *Id.* Although there may well be other circumstances in which the insufficiency of the evidence would be "apparent" to the district court, in the twenty-two years since *Holgate* was decided, we have yet to identify such a circumstance.

¶97 In this case, the insufficiency of the evidence on serious bodily injury was not "so obvious and fundamental" that it should have been "apparent" to the district court. This is not a case in which *no* evidence was presented on the degree of injury that Betty suffered. Rather, the State presented evidence that Betty's injury bled profusely, but that she was able to stop the bleeding by holding her shorts to her neck. The State also

presented at least some evidence from which the jury could infer that the blood loss could have been life threatening if Betty had not been able to apply pressure.

¶98    Betty testified that when Carrera cut her neck, she "could feel the blood" and "see it." She testified, "I had blood all over me. I felt sick, and I told him that I felt sick and weak." Betty stopped the bleeding by holding a pair of shorts to her neck, but when she later vomited, the cut on her neck "burst" open and "started squirting blood all over the sink." She testified, "I had blood all down me." And by the time she woke up her son, "[h]e could see the blood all over."

¶99    Law enforcement witnesses confirmed that the shorts Betty had used to apply pressure to her neck were "soaked" with blood. Police also observed Betty's "blood soaked shirt" and "blood on her arms and hands." The police found blood throughout the cab of the truck and on the sink in the kitchen. They also recovered a "wet bloody paper towel" in a kitchen wastebin and a bloody towel on the master bedroom floor.

¶100    The State elicited testimony from Doctor about the nature of the injury and the risk posed by blood loss:

> Q:    [I]f that cut, that dimension, size and the depth that you described, if it were not treated, if no pressure were applied to stop the bleeding, if it were just allowed to continue to bleed, would there any – would there be any danger from that?
>
> A:    Yes. It's quite possible that the bleeding would stop on its own, but it's also very possible that if left untreated, it could continue to bleed to the point where it could threaten someone's life.

Q: So for example, if it were done at the beginning hypothetically of the sexual assault, and then it remained untreated and open during the course of the sexual assault without being treated, what type of danger would the victim face there?

A: Certainly danger because of bleeding, like I said, but also while being open, a wound with that depth, there's concern for infection being introduced into that area through the course of an assault.

Q: All right. So continued bleeding. What would happen if the bleeding just continued and continued?

A: That person could die.

Q: So really although the cut perhaps looks superficial in appearance, under the right circumstances, it could cause death.

A: Under the right circumstances.

Q: For example, a rape victim who never got a chance to treat it?

A: Yes.

Q: Okay. For example, if something happened to—if it started to heal, but something happened hypothetically to reopen it, such as vomiting, would that cause further danger?

A: Yes, it could.

Q: Through the continued blood loss?

A: Yeah. So when the—when the blood loss starts initially, there's some clotting and coagulation factors that come to that area to heal and allow the bleeding to stop, and if someone were to vomit, for example, it could break that open, the small clot that's forming, and resume bleeding once again.

Q: All right. Thank you for that. So a cut like that could potentially cause a lot of bleeding?

A: It could.

In summary, Doctor testified that it was "very possible" that, "if left untreated," the cut Carrera inflicted "could continue to bleed to the point where it could threaten someone's life" and that person "could die."

¶101   The lead opinion characterizes this testimony as referring "generally" to "cut[s] like this one," because Doctor later "clarified that 'this particular slice to the neck was not . . . life threatening.'" *Supra* ¶ 37. But by testifying that the wound "could threaten someone's life," Doctor was not simply opining about cuts to the neck generally; instead, he was responding to the prosecutor's questions about the specific cut in this case—"that cut, that dimension, size and the depth that you described, if it were not treated." In other words, Doctor was discussing what could have occurred if Betty had been unable to apply pressure and stop the bleeding.

¶102   The lead opinion also relies heavily on Betty's ability to stop the bleeding by applying pressure to the wound. But Betty's successful treatment of the injury does not compel the conclusion that the injury itself did not present a substantial risk of death. The fortuity of prompt treatment does not necessarily lessen the

defendant's culpability under the enhancement statute, which focuses not on the ultimate outcome, but on the degree of injury "the defendant caused." Utah Code Ann. § 76-5-302(3)(b). Indeed, our supreme court has held that it was proper for medical experts "to testify about the risk created by the defendant at the time of the attack, rather than at a subsequent time following timely intervention by paramedics and virtually immediate medical treatment." *State v. King*, 604 P.2d 923, 926 (Utah 1979). In that case, even though the treating physician testified that the injury was "not severe enough to be life-threatening unless it was left untreated and other medical problems developed," the court held that it was still "within the province of the jury to consider the means and manner by which the victim's injuries were inflicted along with the attendant circumstances" in determining whether the injury posed a substantial risk of death. *Id.* Although nothing in our case law prevents the jury from considering the availability of treatment as part of the "attendant circumstances," the jury is entitled to consider the nature of the injury at the time it was inflicted. Thus, Betty's subsequent actions to stop the bleeding before the blood loss became life threatening was not a basis for taking the question from the jury.

¶103 There is still a question of whether the injury Carrera caused, if left untreated, presented not just a risk of death, but a substantial risk of death. But for plain error, it is not enough for the evidence to be insufficient; it must be so insufficient that it should have been apparent to the trial court at the time. The lead opinion asserts that "it is well within the ken of human experience to know that cuts like this do not create a substantial risk of death, under any meaningful definition of the word 'substantial.'" *Supra* ¶ 43. Yet Doctor testified that it was "*very possible* that if left untreated, [the cut] could continue to bleed to the point where it could threaten someone's life." (Emphasis added.) The term "substantial" is not statutorily defined, and nothing in our case law would put the trial court on notice that a "very possible" risk of death falls short of a "substantial risk of death." Even if the

evidence presented was insufficient to prove a substantial risk of death, that insufficiency was not apparent at the time of trial.

¶104   Were we to conclude that the evidence in this case was so obviously and fundamentally insufficient, we would be hard pressed to identify a case in which there was insufficient evidence that did not rise to the level of plain error. In effect, we would be eliminating the distinction between preserved and unpreserved sufficiency claims arising from jury trials, treating them instead like appeals from bench trials. For these reasons, Carrera has not established that the trial court committed plain error by submitting the question of "serious bodily injury" to the jury. Even assuming that the lead opinion is correct that the evidence in this case was insufficient, that insufficiency was not "so obvious and fundamental" that it rose to the level of plain error. *See Holgate*, 2000 UT 74, ¶ 17.

¶105 Based on the ineffective assistance of counsel claims addressed in Part III of the lead opinion, this court vacates all of Carrera's convictions and remands for a new trial. Carrera may be retried for aggravated assault—with the serious bodily injury enhancement—and on all other counts except the third sodomy count as explained in Part I of the lead opinion. On retrial, Carrera will have the opportunity to raise any challenges to the sufficiency of the State's evidence, including the evidence of serious bodily injury.

———————

# CERTIFICATE OF MAILING

I hereby certify that on the 18th day of August, 2022, a true and correct copy of the attached OPINION was sent by standard or electronic mail to be delivered to:


AARON P DODD
FILLMORE SPENCER LLC
ADODD@FSLAW.COM


SEAN D REYES
ATTORNEY GENERAL
DAVID A SIMPSON
ASSISTANT SOLICITOR GENERAL
DASIMPSON@AGUTAH.GOV
criminalappeals@agutah.gov


HONORABLE KEITH C. BARNES
FIFTH DISTRICT, BEAVER DEPT


FIFTH DISTRICT, BEAVER DEPT
ATTN: JESSICA YARDLEY
jessicay@utcourts.gov


Judicial Secretary

TRIAL COURT: FIFTH DISTRICT, BEAVER DEPT, 171500074
APPEALS CASE NO.: 20181053-CA