**2026 UT App 59**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRIAN KEITH BUNTON,
Appellant.

Opinion
No. 20240392-CA
Filed April 16, 2026

Third District Court, Salt Lake Department
The Honorable Adam T. Mow
No. 211907350

Sarah J. Carlquist, Attorney for Appellant

Derek E. Brown and Emily Sopp,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1 Brian Keith Bunton laced mugs of hot chocolate with ketamine and served them to his wife and young stepdaughter. Bunton's wife and stepdaughter both reacted badly to the drug and sought medical treatment. As these events unfolded, the stepdaughter disclosed to her mother that she had been sexually abused by Bunton on numerous occasions. Bunton was charged with and convicted on multiple counts of aggravated sexual abuse of a child, as well as one count each of child endangerment and surreptitious administration of a substance.

¶2 Bunton appeals on multiple grounds, claiming that the district court erred in failing to excuse a biased juror and

admitting DNA evidence, that he received constitutionally ineffective assistance of counsel because his attorney failed to object to the admission of a recorded conversation, and that he was prejudiced by cumulative error. We address only the juror bias issue because we agree that the district court erred in failing to strike a biased juror for cause and therefore vacate the convictions on that basis and remand the case for a new trial.

## BACKGROUND[1]

### *Alleged Sexual Abuse*

¶3    On March 19, 2021, Bunton made three mugs of hot chocolate: one for him, one for his wife (Mother), and one for his stepdaughter (Stepdaughter), who was thirteen at the time. Unbeknownst to Mother or Stepdaughter, two of the mugs were laced with ketamine. Bunton later asserted that he had acquired the ketamine from a friend and intended to use it as a "love potion" to provide Mother with a "euphoric sexual experience." He claimed that he accidentally gave one of the ketamine-laced mugs to Stepdaughter, who drank it before Bunton realized his mistake. Ater consuming the drink, both Mother and Stepdaughter became so ill that they thought they were going to die. Both of them made their way out of the house and lay on the lawn, where they said their goodbyes to each other. While they were lying on the lawn, Stepdaughter asked Mother, "What if [Bunton] did something?" In response to Mother's and Stepdaughter's reaction to the ketamine, Bunton did not call an ambulance. Instead, he drove the two to the emergency room. There, doctors determined that whatever had caused the

---

1. "When reviewing a challenge to a criminal conviction, we recite the facts from the record in the light most favorable to the jury's verdict." *State v. Moore*, 2009 UT App 386, n.1, 223 P.3d 1137 (cleaned up), *aff'd*, 2012 UT 62, 289 P.3d 48.

symptoms was "transient," and after Mother and Stepdaughter started feeling better, they were discharged.

¶4 The morning after being released from the hospital, Mother asked Stepdaughter what she had meant by the question about Bunton doing "something." Stepdaughter then told Mother that Bunton had sexually abused her multiple times.

¶5 Stepdaughter claimed that Bunton had abused her in the following ways. First, she said that Bunton had come into her bedroom while she was watching something on her phone when she was about eight years old, a few months after Bunton and Mother had married. She claimed that Bunton stuck his hand up her shirt and touched her breast and nipple under her bra for a few minutes. The second act allegedly happened a few months later when Stepdaughter was watching her tablet in the family's TV room. She claimed that Bunton sat down next to her and stuck his hand down her shorts, inside her underwear, and touched her vagina. Stepdaughter alleged that Bunton had also slapped her buttocks on multiple occasions. Stepdaughter claimed that after Mother had said something about the slapping being inappropriate, Bunton continued to do it but did so only when no one else was around. Stepdaughter also revealed that on the night of the ketamine incident, Bunton had come into her room, sat on her bed, and stuck his hand up her shirt to rub her back and her breasts. Stepdaughter further claimed there were "a couple of [other] incidents" of Bunton touching her breasts, but she could not remember the specific details.

¶6 The State charged Bunton with three counts of aggravated sexual abuse of a child for (1) touching Stepdaughter's vagina, (2) slapping Stepdaughter's buttocks, and (3) touching Stepdaughter's breast. It was later clarified that the conduct underlying the charges for touching Stepdaughter's breast and vagina occurred between June 2016 and January 2018. And the conduct supporting the charge for touching Stepdaughter's

buttocks occurred between January 2017 and March 18, 2021, which was the day before the ketamine incident. Accordingly, the touching that allegedly occurred during the ketamine incident, which happened on March 19, 2021, was not charged. However, the State did charge Bunton with one count of endangerment of a child and one count of surreptitious administration of a substance in relation to the ketamine incident.

*Jury Selection*

¶7    As relevant here, one juror (Juror 23) expressed reservations about whether he could be unbiased in his deliberations. After the State had finished questioning him, Juror 23—unbidden—initiated this dialogue with the prosecutor:

> *Juror 23*: I do have my own opinions about the . . . case I guess involving children. And I do have young children. And I . . . hope I would be able to maintain my composure I guess is what I'm saying, because it is a sensitive case when you have kids. I'm sure you know.
>
> *Prosecutor*: Yeah. Ultimately, both the State and the Defense, you know, we are looking for a jury that's going to base their decision only on the evidence that's presented in court. And so that's—
>
> *Juror 23*: Right.
>
> *Prosecutor*: —just, ultimately, our question is, can you satisfy those things and really listen to the evidence here that's presented in the . . . courtroom and base your decision solely on that evidence?
>
> *Juror 23*: Okay. Judging by the facts that it's a . . . child assault—is that what it was? Sexual assault

on children? I don't think I'd be able to give an unbiased opinion on the . . . case.

*Prosecutor*: Why do you think that?

*Juror 23*: Why do I think that?

*Prosecutor*: Yeah.

*Juror 23*: Because I see my kids every day, and I love my kids. And I would—I don't know if I would reflect back on my kids during the case. And I just—I don't know.

*Prosecutor*: So I guess—

*Juror 23*: I'm just telling you my—I'm just—

*Prosecutor*: Yeah.

*Juror 23*: —telling you my—my truthful, you know, opinion on it.

*Prosecutor*: And that's—

*Juror 23*: I'm not trying to get out of it or anything. I'm just trying to . . . .

¶8     The prosecutor then tried to convince Juror 23 that having children did not constitute grounds for automatic disqualification of a potential juror for this category of trials:

*Prosecutor*: And we appreciate your honesty. That's what we're trying to get at. The only thing is, is that both the State and the Defense deserve a fair trial. And it's not like we, you know, the State is going to receive a fair trial if we have no one with—you know, all the jurors have no kids, and they don't care—

*Juror 23*: Right.

> *Prosecutor*: —about kids. And they, you know, think that these kinds of charges aren't that big of a deal. I mean, you—
>
> *Juror 23*: I understand.
>
> *Prosecutor*: —can understand why—so what we're really asking is, is—and we understand you have children. But you need to kind of set that aside and not use that as evidence in the case. You need to view the witnesses and . . . decide whether they're telling the truth or not. Is that something—
>
> *Juror 23*: Okay.
>
> *Prosecutor*: —you can do or not?
>
> *Juror 23*: Then I would do that, yes.
>
> *Prosecutor*: Okay. I don't have any further questions.

Bunton's counsel then followed up with this question:

> *Bunton's Counsel*: [I]f the evidence presented that it was a teenager making these allegations, would that change your ability in any way or your answers—
>
> *Juror 23*: Well, I've already stated that once it comes to the case, I would try it as a—or give my opinion only on the facts. And that's what I said at the end there, so.
>
> *Bunton's Counsel*: Understood.

¶9 The court then called for discussion on Juror 23. The prosecutor argued, "I think he was very clear at the end that he understood. He would base his decision on the evidence." Bunton's counsel responded, "I tried to clarify with him about [a] teenager maybe being different. . . . But his first answer was saying

that, because—he would have a difficult time, because he would be imagining his own kids. I'm going to ask to strike him for cause." The court denied the motion: "I'm going to deny the motion to strike him. I mean, . . . his answers have . . . left me with the idea that he can be fair and impartial. I did not expect to get to that conclusion after initially hearing from him. But since, I . . . think he can be."

*Trial*

¶10    At trial, Mother and Stepdaughter testified consistently with the events as summarized above. Bunton's father-in-law also testified, saying that Bunton had told him about getting the ketamine, lacing the hot chocolate with it, and accidentally giving it to Stepdaughter.

¶11    The jury acquitted Bunton on the charge of aggravated sexual abuse related to slapping Stepdaughter's buttocks, but it otherwise convicted Bunton as charged.

## ISSUE AND STANDARD OF REVIEW

¶12    Bunton appeals, arguing that the district court erred in seating a biased juror. A district court has a certain amount of discretion when deciding whether to grant a motion to excuse a juror for cause, and we reverse only when a court exceeds the bounds of that discretion. *State v. Ellis*, 2020 UT App 119, ¶ 10, 473 P.3d 211. We review the district court's exercise of that discretion, however, "in light of the fact that it is a simple matter to obviate any problem of bias simply by excusing the prospective juror and

selecting another." *State v. Wach*, 2001 UT 35, ¶ 25, 24 P.3d 948 (cleaned up).[2]

ANALYSIS

¶13　Bunton argues that the district court exceeded its discretion when it seated Juror 23 over his counsel's for-cause challenge. Under the Utah Rules of Criminal Procedure, "[n]o person may serve as a juror, if challenged, unless the judge is convinced the juror can and will act impartially and fairly." Utah R. Crim. P. 18(e)(14). "When reviewing the propriety of a denial . . . of a challenge for cause, we look to the entire voir dire exchange with the challenged juror." *State v. Maestas*, 2012 UT 46, ¶ 41, 299 P.3d 892 (cleaned up). Ordinarily, "to prevail on a claim of error based on the court's failure to remove a prospective juror, a defendant must demonstrate that (1) the court erred when it failed to excuse a prospective juror for cause, *and* (2) the error prejudiced the defendant, or, in other words, that a member of the jury that was empaneled was partial or incompetent." *Id.* (cleaned up). This means that "a defendant suffers prejudice when . . . denied a fair trial because a biased juror sat on the jury." *State v. King*, 2008 UT 54, ¶ 18, 190 P.3d 1283. In other words, "the presence of a biased juror, like the presence of a biased judge, is a structural defect in the constitution of the trial mechanism that defies harmless error analysis. For these reasons, the seating of a biased juror who

---

2. Bunton also raises (1) a claim of ineffective assistance of counsel related to the stipulated admission of exhibits containing unredacted recordings of phone calls in which Bunton discussed possible prison sentences and themes of religious repentance and forgiveness with his adult stepson, (2) a claim that the district court erred in allowing certain DNA evidence to be admitted, and (3) a claim of cumulative error. Because we determine that Bunton is entitled to a new trial based on his first claim of error, we need not address these additional issues on appeal.

should have been dismissed for cause requires reversal of the conviction." *State v. Carrera*, 2022 UT App 100, ¶ 83, 517 P.3d 440 (cleaned up).

¶14 Our supreme court has articulated the following standard to determine whether a district court abused its discretion in declining to remove a prospective juror for cause:

> Once statements are made during voir dire that facially raise a question of partiality or prejudice, an abuse of discretion occurs unless the challenged juror is removed by the court or unless the court or counsel investigates further and finds the inference rebutted. Rebuttal is accomplished by showing that a juror's statement was merely the product of a light impression and not one that would close the mind against the testimony that may be offered in opposition.

*State v. Wach*, 2001 UT 35, ¶ 27, 24 P.3d 948 (cleaned up). Applying this standard to the case at hand, we conclude that the district court exceeded its discretion when it denied Bunton's for-cause challenge to Juror 23.

¶15 Juror 23's statements during voir dire would cause any reasonable person to suspect that he could not act impartially. Just as his individual voir dire was wrapping up, Juror 23 spontaneously disclosed, "I do have my own opinions about the . . . case I guess involving children. And I do have young children. And I . . . hope I would be able to maintain my composure . . . ." Obviously aware that Juror 23's disposition was problematic, the prosecutor asked him if he could "really listen to the evidence here that's presented in the . . . courtroom and base [his] decision solely on that evidence"—essentially begging Juror 23 to give it the old college try and make his best effort. Juror 23 remained unconvinced and came back with an unvarnished answer: "I don't think I'd be able to give an unbiased opinion on the . . . case."

And he even provided insight into his thought process: "Because I see my kids every day, and I love my kids. And . . . I don't know if I would reflect back on my kids during the case. And I just—I don't know."

¶16 This was a clear and unequivocal expression of actual bias. "The most characteristic feature of prejudice is its inability to recognize itself. It is unrealistic to expect that any but the most sensitive and thoughtful jurors (frequently those least likely to be biased) will have the personal insight, candor and openness to raise their hands in court and declare themselves biased." *State v. Ball*, 685 P.2d 1055, 1058 (Utah 1984). But that is exactly what we have here—a juror with the insight, candor, openness, and fundamental integrity to offer an unsolicited admission that he would be unable to set aside his personal feelings about child sexual abuse such that he could be an impartial factfinder.

¶17 The question then becomes whether the prosecutor's subsequent questioning sufficiently rebutted this inference. The short answer is that it didn't. Rather than investigating the depth of the bias, the prosecutor engaged in a line of questioning that suggested to Juror 23 that the State could not "receive a fair trial" if jurors with children were excluded. The prosecutor told Juror 23 that he should "kind of set [having children of his own] aside" and just "decide whether [the witnesses at trial were] telling the truth or not." Given this take on the situation, Juror 23 eventually acquiesced, stating, "Then I would do that, yes."

¶18 "It is not enough if a juror believes that he or she can be impartial and fair." *Wach*, 2001 UT 35, ¶ 33. Indeed, a statement from a juror expressing an intention "to be fair and impartial loses much of its meaning in light of other testimony and facts which suggest a bias. Accordingly, the court, not the juror, must determine a juror's qualification." *Id.* (cleaned up). Here, Juror 23's agreement—after some persuading—that he would "kind of set . . . aside" his personal misgivings and try to determine if the

witnesses were telling the truth does not change the fact that he—explicitly and spontaneously—stated that he did not "think [he would] be able to give an unbiased opinion on the . . . case."

¶19   Rebuttal of bias must show that the juror's prior statement was merely the product of a "light impression." *Id.* ¶ 27 (cleaned up). It was not enough for Juror 23 to eventually state that he thought he could be fair when he assented to the prosecutor's question. "While jurors ordinarily might place more weight on a judge's comments than those of the State, the State's representative commands similar respect, and with that respect the same inherent danger exists that, when improperly prompted, a juror will attempt to say the 'right' thing or otherwise please the prosecutor with certain responses." *State v. Williams*, 2018 UT App 96, ¶ 28, 427 P.3d 434. Here, the questioning by the prosecutor wasn't designed to find out if Juror 23 was truly biased; instead, its purpose was to convince Juror 23 that he really wasn't biased. But the suggestive questioning here to get the answer the prosecutor wanted did little to address the glaring issue of Juror 23's self-professed bias.

¶20   Even when the prosecutor attempted to rehabilitate him, Juror 23 never backtracked on his assertion of personal bias. The prosecutor asked him if he could "really listen to the evidence here that's presented in the . . . courtroom and base [his] decision solely on that evidence." And Juror 23 responded in no uncertain terms, saying that he didn't "think [he'd] be able to give an unbiased opinion on the . . . case." The prosecutor pressed on and asked him if he could "view the witnesses and . . . decide whether they're telling the truth or not." Juror 23 said he "would do that." And when Bunton's counsel followed up, Juror 23 went only so far as to say that he would "try" to "give [his] opinion only on the facts." This is a far cry from any kind of assertion that he would not be biased. And these prompted concessions fall far short of providing a reasonable basis to overcome Juror 23's unabashed and forthright initial assertion that he had no confidence in his

ability to proceed in an unbiased fashion in a case of this nature. On the contrary, these admissions do very little to address Juror 23's original confession of bias and his expressed uncertainty as to whether he could maintain his composure.[3]

---

3. To be clear, our conclusion that Juror 23 was biased is not based on the fact that he had children. He was biased because he said—out loud and without being prompted—that the fact that he had children made him biased. Not everyone who has children feels this way. Accordingly, our conclusion that Juror 23 was biased in no way suggests that everyone who has children is ipso facto barred from jury service in child-abuse-related cases. But people who have children and who feel—because of their parental sensitivities—that they can't be fair and impartial in child-abuse-related cases are barred from jury service in such cases. This bar arises not because they have children but because they feel that they can't be fair and impartial owing to their parental status. Accordingly, the State's concern that it cannot get a fair trial if people with children are barred from the jury pool is unfounded. It doesn't matter if a juror is a parent, but it makes all the difference if that juror expressly, spontaneously, and adamantly maintains that he or she cannot be unbiased owing to the juror's parenthood. Hence this is a question not of parental *status* but of a person's *state of mind*. "A prospective juror's status, whether that be professional, social, or whatever, is not by itself a sufficient ground for disqualifying the juror"—rather, it is that prospective juror's "state of mind, in which could inhere some bias, prejudice, or preconception, that would render the person partial and hence unfit as a juror." *Hernandez v. State*, 742 A.2d 952, 962 (Md. 1999) (cleaned up). "Short of those instances where there is a demonstrably strong correlation between the status in question and a mental state that gives rise to cause for disqualification, mere status or acquaintance is insufficient to establish cause for disqualification of a prospective juror." *Dingle v. State*, 759 A.2d 819, 825 (Md. 2000) (cleaned up).

¶21    Because Juror 23's initial, unsolicited admission of bias was not sufficiently rebutted by his assent to the prosecutor's persuasive suggestions, the district court exceeded its discretion in denying the motion to strike. And because a biased juror sat on the panel, Bunton was prejudiced, so we must vacate his convictions. *See Carrera*, 2022 UT App 100, ¶ 83.

## CONCLUSION

¶22    The district court exceeded its discretion in denying the motion to strike Juror 23 for cause. On that basis, we vacate Bunton's convictions and remand this matter for a new trial.

———————