**2026 UT App 92**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOSEPH MANUEL PEREZ,
Appellant.

Opinion
No. 20240962-CA
Filed June 11, 2026

Second District Court, Ogden Department
The Honorable Reuben J. Renstrom
No. 231903111

Emily Adams, Freyja Johnson, Brittany A. Urness,
and Melissa J. Townsend, Attorneys for Appellant

Derek E. Brown and Jason Greene,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and AMY J. OLIVER
concurred.

ORME, Judge:

¶1　Joseph Manuel Perez was convicted of aggravated burglary, aggravated assault, and destruction of property after he disrupted a party by kicking down his neighbors' door and pointing what turned out to be a BB gun at them. On appeal, Perez argues his trial counsel (Counsel) provided ineffective assistance in failing to request for-cause removal of several allegedly biased jurors. He also argues the trial court failed to resolve what he views as an inaccuracy in the presentence investigation report (the PSI). We disagree with Perez's claims and affirm.

## BACKGROUND[1]

*The Incident*

¶2      Perez lived above an apartment occupied by a neighbor (Neighbor), Neighbor's girlfriend (Girlfriend), and their children. One day, Perez asked Neighbor to "hold" his backpack for him while he went to see a friend. Neighbor did not look inside, but he knew that Perez "carrie[d] his weapon" and alcohol in the backpack, so Neighbor "put it away" for him.

¶3      Later that day, Neighbor and Girlfriend hosted a gathering in their apartment that Perez attended. But after "a pretty intoxicated" Perez became "very aggressive," "took out his magazine and went to [get] his gun," Girlfriend "took the clip away from him" and asked him to leave. Neighbor and Girlfriend put the magazine in the backpack, which remained where Neighbor had stored it.

¶4      Perez left the apartment, and Neighbor deadbolted the door behind him. But five minutes later, Perez came back; kicked down the door, breaking it off its hinges; and pointed a different gun—what looked like "a black pistol"—at Girlfriend and her sister. Neighbor, who was standing near the door, tackled Perez, "put him on the ground," and "beat him up until he wasn't a threat," leaving Perez with serious injuries. During the scuffle, Neighbor disarmed Perez, and Girlfriend's sister grabbed the gun. It turned out to be a BB gun.

¶5      Police responded to the scene and recovered the BB gun. They also later recovered Perez's backpack and found a firearm inside. An officer (Officer) interviewed Perez at the hospital

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Suhail*, 2023 UT App 15, n.1, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023).

where he was being treated for his injuries. Officer's body camera captured this interview. In the footage, Perez admitted that the BB gun had been at his apartment "for a long time," but when Officer asked if the BB gun belonged to him, he said, "I don't know" and, "It's just there." When Officer asked whether the BB gun "belong[ed] to everybody," Perez answered, "Pretty much." He maintained that he did not know who bought the BB gun and said, "Nobody touches it. It's just in the . . . hall drawer." When Officer asked Perez who had the BB gun first that night, Perez responded, "Well, if it was at my house, I had it first. Then somebody else took it from me, right?"

¶6    Perez was charged with aggravated burglary, two counts of aggravated assault, and destruction of property related to his breaking down the door and brandishing the BB gun.[2] For the firearm found in the backpack, Perez was charged in a separate case with possession of a firearm by a restricted person. A consolidated preliminary hearing was held for both cases. As relevant here, Neighbor testified at the hearing that Perez was "known to have weapons" and that he "carrie[d] his weapon" in his backpack. Neighbor stated that he had seen Perez "multiple times" with a specific gun. Perez was bound over on all charges.

*Jury Selection*

¶7    During jury selection at the start of trial in this case, the court asked the prospective jurors whether any of them would "have any difficulty affording Mr. Perez his trial rights and understand[ing] that he is innocent until proven guilty beyond a reasonable doubt." The court explained, "In other words, is there anybody here who is just—if somebody gets charged, they're guilty, or is everybody here willing to afford him his right to . . . be recognized as innocent unless and if the State can prove otherwise?" No jurors indicated an unwillingness to do so. The court then asked, "Is there any other reason known likely only

---

2. Perez was charged with an additional count of aggravated assault that was later dismissed.

unto you as to why you would not be impartial in this case?"
Again, no jurors raised their hands.

¶8     Counsel then addressed the jury pool stating,

> [W]e have in our justice system . . . the presumption
> of innocence. So Mr. Perez has been charged with a
> . . . crime, and he is sitting here at my counsel table
> with me, and we can say in our heads that that . . .
> doesn't bother us at all. I want you to kind of go
> deeper than that.
>
>      Do you have any thought—if you have any
> thought, just an inkling of the fact that he was
> charged, he must have done something wrong, raise
> your hand.

Two potential jurors raised their hands. Counsel then asked,
"Anyone else? It's okay. We're . . . here for biases." An
unidentified person asked Counsel, "[Y]ou're clarifying if—he
must've done something wrong, not he must be guilty." Counsel
answered, "Correct. He must've done something wrong to be
sitting here." Several prospective jurors raised their hands in
response, including Juror 11 and Juror 12.

¶9     Counsel went on, stating,

> So you will hear, and I'm sure all of you know
> because we've all—we either listen to crime
> podcasts or—or watch, you know, CSIs . . . . So we
> all know that a defendant or somebody accused of a
> crime has the right to remain silent. They also have
> the right to not testify, should they so choose. That's
> a constitutional right. Right? But, oftentimes, what
> we have found is that when a . . . jury leaves the trial,
> they think, "Man, it really would've changed my

mind if I had heard from the defendant—I'd heard from the accused."

So I'm kind of asking you to do something crazy with me, and that is to pretend you are picked for the jury, and then step back and say, "It really would have changed how I thought about things if I had heard from the accused." Raise your hand.

Several more prospective jurors raised their hands in response, including Juror 3, Juror 11, and Juror 22. Counsel did not clarify these responses.

¶10    Later, the prosecutor explained,

For those that indicated simply because he was charged, he must have done something wrong, the judge will instruct you that simply the fact that he was charged is not something that you can account for in your deliberation. He will tell you, you can't use that in making your decision.

The prosecutor then asked, "Is there anybody that could not follow that instruction? If you could not follow that instruction from the judge, please raise your hand." No hands were raised. The prosecutor went on,

Again, kind of as to that last question, if the defendant chooses not to testify, some of you had a feeling that he probably should testify. If the judge tells you he has the constitutional right not to testify and that you cannot take that into account in your deliberation, could all of you follow that instruction? Is there anyone that could not follow that instruction? Please raise your hand.

Again, no hands were raised.

¶11   The court then asked Counsel if she wanted to follow up on any responses to the questions asked so far. She declined. But Counsel questioned a different prospective juror about his indication in the jury questionnaire that he had been a victim of assault. And at a sidebar conference, Counsel raised concerns about another prospective juror who had allegedly made gestures toward Perez in the courtroom. The court questioned this juror, and Counsel then moved to "strike the whole jury pool," apparently thinking the entire venire was tainted by the court's inquiry about the alleged gestures. The court denied this motion. The jury that was eventually impaneled included Juror 3, Juror 11, and Juror 12, with Juror 22 seated as an alternate.

*Trial and Sentencing*

¶12   During trial, Neighbor, Girlfriend, Officer, and other law enforcement witnesses testified about the incident. During Officer's testimony, the State played several portions of the body camera footage of Perez's hospital interview. Officer also read portions from a transcript he had prepared of the interview. The jury found Perez guilty of aggravated burglary, one of the aggravated assault counts, and destruction of property. He was acquitted on the remaining aggravated assault charge.

¶13   Prior to sentencing, Adult Probation and Parole (AP&P) prepared the PSI, which indicated that Perez had "declined to submit the presentence report questionnaire." But the PSI also noted that Perez "advocates for a sentence including alcohol abuse treatment, supervised probation, restitution," and further education.

¶14   At the sentencing hearing, Counsel moved for a continuance based on the PSI's statement that Perez had declined to submit the questionnaire. Counsel argued that Perez's responses to the questionnaire would have given "at least some context to the Court," and without them, the PSI was "not a full recommendation." The State suggested that Perez could make any statements he would have made in the questionnaire at the

hearing. The court asked Counsel, "[I]s the concern that AP&P's recommendations would be different if he would've [completed the questionnaire]?" Counsel said, "Maybe. I don't know. I can't speak for AP&P." But she reiterated her belief that answering the questionnaire "could potentially change some of the recommendations" in the PSI.

¶15 The court laid out its "severalfold" thoughts. First, the court stated it wanted to try to contact the AP&P agent who prepared the PSI to see if he could clarify the statement regarding the questionnaire. Next, the court explained, "If a defendant chooses not to participate in [the questionnaire], that's fine," and, "That means they'll . . . just have less say in this recommendation." And the court assured the parties, "I don't live and die by these things," and "I vary from them all the time." The court also recognized that AP&P's "recommendation was not based upon [Perez's] lack of participation as much" as "the guidelines [that] were indicating imprisonment." And the court said that it was "putting less and less value into things that may be missing . . . in these reports" from AP&P. Thus, the court expressed its "intention . . . to go forward" with sentencing.

¶16 Counsel argued again that without the questionnaire, the PSI did not include "mitigating circumstances" that could have affected AP&P's sentencing recommendation. The court then stated it was "totally baffled" by the PSI's statement that Perez "advocates for a sentence including alcohol abuse treatment, supervised probation, restitution," and further education, and asked, "How does he advocate for anything if he didn't fill out the [questionnaire]?" The court unsuccessfully tried to reach AP&P over the phone to answer that question and then asked the parties to "walk . . . through how these presentencing investigations go." Counsel told the court that Perez had participated in an interview and that the questionnaire would have added to Perez's "version of events" and "mitigating circumstances." Perez himself told the court he had filled out the questionnaire and mailed it from jail. The court then asked Counsel, "Do you believe that AP&P's really going to change their recommendation?" Counsel answered, "I

just don't feel that I have any basis, nor does anyone, to answer that question of whether there would be a different recommendation."

¶17 The court denied Counsel's motion to continue sentencing and proceeded to sentence Perez according to AP&P and the State's recommendations. Perez appeals.

## ISSUES AND STANDARDS OF REVIEW

¶18 Perez argues Counsel provided ineffective assistance in failing to have the allegedly biased jurors stricken for cause. "When an ineffective assistance claim is raised for the first time on appeal, it presents a question of law." *State v. Cortez-Izarraraz*, 2025 UT App 116, ¶ 22, 575 P.3d 1240 (quotation simplified).

¶19 Perez also argues that the trial court should not have sentenced him without first resolving the "alleged inaccuracy" about the questionnaire in the PSI. "Whether the trial court properly complied with a legal duty to resolve on the record the accuracy of contested information in sentencing reports is a question of law that we review for correctness." *State v. Samulski*, 2016 UT App 226, ¶ 9, 387 P.3d 595 (quotation simplified), *cert. denied*, 390 P.3d 725 (Utah 2017).[3]

## ANALYSIS

### I. Jury Selection

¶20 "The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel" and "to an unbiased

---

3. The parties suggest a correctness standard of review, but their arguments also address whether the court's failure "to resolve an inaccuracy in the PSI" was an abuse of discretion. Because the substance of Perez's argument focuses on the court's failure to resolve the inaccuracy, we apply the correctness standard.

and impartial jury." *State v. King*, 2008 UT 54, ¶ 15, 190 P.3d 1283. "Among the most essential responsibilities of defense counsel is to protect his or her client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense." *State v. Courtney*, 2017 UT App 62, ¶ 10, 415 P.3d 604 (quotation simplified). Perez argues that Counsel abdicated this responsibility in allowing several allegedly biased jurors to be impaneled.

¶21　In particular, Perez points to the following:

- Juror 11 and Juror 12 raised their hands in response to Counsel asking, "Do you have any . . . thought, just an inkling of the fact that he was charged, he must have done something wrong, raise your hand," and then telling the jurors to speak up if they believed Perez "must've done something wrong to be sitting here."

- Juror 3 and Juror 11 raised their hands in response to Counsel stating, "So I'm kind of asking you to do something crazy with me, and that is to pretend you are picked for the jury, and then step back and say, 'It really would have changed how I thought about things if I had heard from the accused.'"

Perez argues that Counsel's failure to challenge Juror 3, Juror 11, and Juror 12 based on these responses amounted to ineffective assistance.[4] We disagree.

---

4. We do not analyze Perez's claim regarding Juror 22, who sat only as an alternate and did not participate in the jury's deliberation.

¶22 "With respect to any ineffectiveness claim, a defendant must first demonstrate that counsel's performance was deficient, in that it fell below an objective standard of reasonable professional judgment." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92. "Second, the defendant must show that counsel's deficient performance was prejudicial—i.e., that it affected the outcome of the case." *Id.*

¶23 "While proving ineffective assistance of counsel is never particularly easy, in the jury selection context a defendant's task is even more daunting than usual." *State v. Carrera*, 2022 UT App 100, ¶ 52, 517 P.3d 440 (quotation simplified), *cert. denied*, 525 P.3d 1264 (Utah 2023). "Counsel is given an especially wide berth" in selecting a jury. *State v. Marquina*, 2018 UT App 219, ¶ 37, 437 P.3d 628 (quotation simplified), *aff'd*, 2020 UT 66, 478 P.3d 37. "There are a multitude of inherently subjective factors typically constituting the sum and substance of an attorney's judgments about prospective jurors." *Litherland*, 2000 UT 76, ¶ 21. And "[a]n attorney's decisions regarding jury selection may even appear counterintuitive, particularly when viewed from the perspective of a bare transcript on appeal." *Id.* ¶ 22. "For instance, an attorney may make a reasoned judgment that a prospective juror's consciousness of, and concern for, his or her own potential bias actually provides a more sure foundation for confidence in that juror's reasoning processes," and the "attorney may even sense that the prospective juror is likely to 'overcompensate' by assigning more weight or credibility to testimony that tends to oppose the juror's own potential bias." *Id.* "In short, a trial attorney's decisions during jury selection legitimately may be based on little more than personal preference." *Id.* ¶ 23.

¶24 "Because jury selection is more art than science," and "because trial counsel's jury selection decisions are so inherently subjective," appellate courts "make two distinct presumptions when trial counsel does not object to, or remove, a particular juror." *Id.* ¶¶ 20, 21, 24 (quotation simplified). First, failure to do so "is presumed to be the product of a conscious choice or preference"—even when the decision is "manifested by nothing

more than silence in many circumstances." *Id.* ¶ 20. Second, "trial counsel's presumably conscious and strategic choice to refrain from removing a particular juror is further presumed to constitute effective representation." *Id.*

¶25 But a defendant may rebut this "presumption of effectiveness" by showing

> (1) that defense counsel was so inattentive or indifferent during the jury selection process that the failure to remove a prospective juror was not the product of a conscious choice or preference; (2) that a prospective juror expressed bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove that juror; or (3) that there is some other specific evidence clearly demonstrating that counsel's choice was not plausibly justifiable.

*Id.* ¶ 25 (footnote omitted). Perez does not make any such showing here.

¶26 First, we cannot say that Counsel was "so inattentive or indifferent during the jury selection process that the failure to remove" Juror 3, Juror 11, and Juror 12 "was not the product of a conscious choice or preference." *Id.*[5] In addition to posing questions to which these jurors raised their hands, *see supra* ¶¶ 8-9, Counsel expressed her concern about a different

---

5. The State suggests that our Supreme Court's decision in *State v. Gallegos*, 2020 UT 19, 463 P.3d 641, abrogated this element of a defendant's burden to rebut the presumption of effectiveness. *Gallegos* held that "trial counsel's subjective reasoning is not the critical component of the" ineffective assistance inquiry and thus not "the standard by which her actions are judged." *Id.* ¶ 47. But we do not see this as an abrogation of the necessity to show that counsel was inattentive per the analysis the Court laid out in *State v. Litherland*, 2000 UT 76, ¶ 25, 12 P.3d 92.

prospective juror who allegedly made gestures toward Perez in the courtroom and after the court questioned him, moved to "strike the whole jury pool." And Counsel inquired into yet another prospective juror's indication on his questionnaire that he had been a victim of assault. *See generally State v. Williams*, 2025 UT App 118, ¶ 31, 576 P.3d 1142 (concluding that counsel's participation "in three bench conferences during jury selection" and "a for-cause challenge to a different potential juror" showed "active[] participat[ion] in the jury selection process"), *cert. denied*, 581 P.3d 554 (Utah 2025).

¶27 Nor can we say that these jurors expressed such "strong or unequivocal" bias "that no plausible countervailing subjective preference could justify" Counsel's decision not to challenge them. *Litherland*, 2000 UT 76, ¶ 25. Juror 3, Juror 11, and Juror 12 did not voluntarily or repeatedly affirm that they would be unable to remain unbiased because of their personal background. *See State v. Bunton*, 2026 UT App 59, ¶¶ 15–16; *Carrera*, 2022 UT App 100, ¶ 54. Rather, they simply raised their hands or responded with silence. On the cold record before us, we do "not have the benefit of observing" their "demeanor, personality, or interaction with others." *Carter v. Galetka*, 2001 UT 96, ¶ 41, 44 P.3d 626. "For all we know," these jurors were "the most attentive juror[s], or the only one[s] who glanced disparagingly at the prosecution or sympathetically toward the defendant." *Litherland*, 2000 UT 76, ¶ 24 (quotation simplified). But we do know that, while they may have indicated some bias in response to Counsel's initial questions, these jurors' subsequent responses to the prosecutor's follow-up questions reaffirmed their ability to remain impartial.

¶28 After Juror 11 and Juror 12 indicated that they thought Perez "must've done something wrong to be sitting" in court, the prosecutor reminded the jurors, "the judge will instruct you that simply the fact that he was charged is not something that you can account for in your deliberation" and that "you can't use that in making your decision." The prosecutor then asked, "Is there anybody that could not follow that instruction?" No prospective jurors indicated they could not. Then, after Juror 3 and Juror 12

indicated that hearing directly from Perez would likely affect "how [they] thought about things," the prosecutor clarified, "If the judge tells you he has the constitutional right not to testify and that you cannot take that into account in your deliberation, could all of you follow that instruction?" No prospective jurors indicated an inability to do so.

¶29 Sequence matters here. After receiving clarifications, the prospective jurors indicated "that they believed that they had the ability to set aside their stated bias and use their best judgment." *See State v. Arriaga*, 2012 UT App 295, ¶ 16, 288 P.3d 588, *cert. denied*, 298 P.3d 69 (Utah 2013). True, "it is not enough if a juror believes that he or she can be impartial and fair." *Bunton*, 2026 UT App 59, ¶ 18 (quotation simplified). And "a statement from a juror expressing an intention to be fair and impartial loses much of its meaning in light of other testimony and facts which suggest a bias." *Id.* (quotation simplified). *See State v. Taylor*, 2025 UT App 14, ¶ 27, 564 P.3d 962 (concluding that a juror's "self-assessment" of her ability to follow instructions and "render a fair and impartial verdict" was "questionable in the face of her continued responses indicating she would give more weight to the testimony of law enforcement witnesses"). But there is no other indication of bias from these jurors after the prosecutor's clarification. To the contrary, "[t]here is little reason to doubt" their self-assessments, as the jury eventually acquitted Perez on one of the aggravated assault charges against him. *See Arriaga*, 2012 UT App 295, ¶ 16.

¶30 Thus, we conclude that these three jurors did not exhibit bias so "strong or unequivocal" that Counsel's only option was to challenge them for cause. *Cf. Bunton*, 2026 UT App 59, ¶¶ 16–21 (concluding that "the glaring issue" of a juror's "unabashed and forthright" "self-professed bias" was unrebutted by the prosecutor's "persuading" and "suggestive questioning").

¶31 And finally, we see no "other specific evidence clearly demonstrating" that Counsel's actions were "not plausibly justifiable." *Litherland*, 2000 UT 76, ¶ 25. Counsel "could have

exercised many subjective strategic judgments to arrive at the conclusion that" the three jurors "would be more favorably disposed to [Perez] in comparison to other prospective jurors." *Id.* ¶ 28. "Written records give us only shadows for measuring the quality of such efforts." *Id.* ¶ 24 (quotation simplified). And on this record, we cannot say that Counsel's actions were otherwise unjustifiable.

¶32   In sum, Perez has not rebutted the presumption that Counsel's actions amounted to "objectively reasonable representation," and his ineffective assistance claim therefore fails. *Id.* ¶ 29. *See id.* (recognizing that "[w]here the first prong" of the ineffective-assistance test "is met, we need not address the second prong relating to prejudice").[6]

---

6. Perez also argues Counsel was ineffective in failing to introduce portions of his hospital interview with Officer that were not shown to the jury. He argues that statements he made therein showed that Neighbor and Girlfriend knew that the gun he pointed at them was a BB gun and not a real firearm, casting doubt on whether the elements of aggravated assault were met. Perez has filed a motion for remand under rule 23B of the Utah Rules of Appellate Procedure to develop the record in support of this claim. *See* Utah R. App. P. 23B(a). But "if the defendant could not meet the test for ineffective assistance of counsel, even if his or her new factual allegations were true, there is no reason to remand the case, and we should deny the motion." *State v. Griffin*, 2015 UT 18, ¶ 20, 441 P.3 1166 (quotation simplified). Here, Perez has not convinced us that Counsel's decision not to introduce other portions of the interview amounted to deficient performance. The statements in the transcript Perez attached to his motion are not as exculpatory as he urges. And it was reasonable for Counsel to be concerned about the risk that introducing such statements would prompt the State to introduce evidence of Perez's possession of a real firearm on the same day. Because Perez cannot show that Counsel performed deficiently in this regard,

(continued…)

## II. The PSI

¶33    Perez argues the trial court failed to resolve the PSI's allegedly inaccurate statement that he "declined to submit the presentence report questionnaire," and he asserts that he should be afforded a remand to allow the court to do so. We are not persuaded.

¶34    Under the Utah Code, "If there is an alleged inaccuracy in the presentence investigation report that is not resolved . . . before sentencing . . . the alleged inaccuracy shall be brought to the attention of the court at sentencing" and "the court may grant an additional 10 working days . . . to allow the parties . . . to resolve" it. Utah Code Ann. § 77-18-103(5)(a)(i) (LexisNexis Supp. 2025).[7] But "[i]f the court does not grant additional time . . . or the alleged inaccuracy cannot be resolved after 10 working days, and *if the court finds that there is an inaccuracy* in the presentence investigation report, the court shall . . . enter a written finding as to the relevance and accuracy of the challenged portion" and "provide the written finding to the [Utah Department of Corrections] or the law enforcement agency" involved. *Id.* § 77-18-103(5)(a)(ii) (emphasis added). In other words, there must be an inaccuracy necessitating that the sentencing court enter written findings.

¶35    Here, the court discussed the allegedly inaccurate statement at some length at the sentencing hearing, though it ultimately denied Perez's request for a continuance and proceeded to sentence him without making explicit findings about the statement. We may infer that the court found that the statement was not inaccurate. *See State v. Samul*, 2018 UT App 177,

---

this ineffective-assistance claim cannot succeed, and we deny the motion for remand.

7. We cite the current version of the statute for convenience, as it is identical to the version in effect at the time of Perez's sentencing.

¶ 21, 436 P.3d 298 ("As a general rule we will uphold the sentencing court even if it failed to make findings on the record whenever it would be reasonable to assume that the court actually made such findings.") (quotation simplified), *cert. denied*, 432 P.3d 1233 (Utah 2018). It would be reasonable for the court to assume, based on Perez's assertions at sentencing, that both parties were right in a sense—Perez believed he had properly mailed the questionnaire back to AP&P from jail but AP&P never received it. But without first finding that the statement in the PSI was inaccurate, the court was not required to make further written findings.

¶36　Moreover, Perez does not argue on appeal that the outcome of his sentence would have been different had the court made explicit findings regarding the accuracy of the contested statement. And we fail to see how he could. At sentencing, the court specifically stated that it did not "live and die by" AP&P's recommendations and it varied "from them all the time." The court also noted that the sentencing recommendation in the PSI was not affected by whether Perez returned the questionnaire to AP&P but rather on his "criminal history and other factors." And in sentencing Perez, the court relied on the severity of the incident as well as his past parole status—not on Perez's failure to return the questionnaire to AP&P.

¶37　In sum, we see no error in the court's handling of the PSI.

## CONCLUSION

¶38　Counsel was not ineffective in choosing not to seek removal of allegedly biased prospective jurors. And the trial court did not err when it did not make written findings regarding the alleged inaccuracy in the PSI. Accordingly, we affirm Perez's convictions and sentence.

————————